**UNITED STATES of America, Plaintiff,**

v.

**Innocent Acho IWUAMADI, Defendant.**

**No. CR 88–O–29.**

United States District Court,
D. Nebraska.

June 26, 1989.

Robert F. Kokrda, Omaha, Neb., for plaintiff U.S.

Gary M. Bodnar, for defendant Innocent Acho Iwuamadi.

CAMBRIDGE, District Judge.

This matter is before the Court upon the magistrate's findings and recommendations (Filing No. 21). The Court, having reviewed said findings and recommendations and noting that no objections have been filed thereto, finds that they should be adopted and confirmed in all respects.

Accordingly,

IT IS ORDERED:

(1) The findings and recommendations of the magistrate are adopted and confirmed in all respects; and

(2) The defendant's motion to dismiss (Filing No. 16) is granted and this case is dismissed.

## MAGISTRATE'S FINDINGS AND RECOMMENDATIONS

RICHARD G. KOPF, United States Magistrate.

Presented to me is the motion to dismiss (filing 16) filed by the defendant. Evidentiary hearing and oral argument were held on April 26, 1989. The issue presented for my findings and recommendations is whether the failure of the government to try the defendant within 180 days of the defendant's demand to be tried, where the defendant was in state custody at the time the federal government lodged a detainer against him, requires dismissal of the indictment under the provisions of article III of the Interstate Agreement on Detainers, 18 U.S.C.A. App. § 2 (1970). Concluding that the facts of this case require dismis-

sal, I shall, nevertheless, recommend, pursuant to the recently enacted amendments to the Interstate Agreement on Detainers, 18 U.S.C.A. App. § 9 (Supp.1989), that the dismissal occur without prejudice.

## I.

The defendant, a foreign national, is charged in a multicount indictment handed up on April 21, 1988. (Filing 2). Essentially, the defendant is charged with bank fraud, 18 U.S.C.A. § 1344 (Supp.1989), and fraudulent use of a social security number, 42 U.S.C.A. § 408(g) (1983). The criminal cover sheet reflects that, at the time the indictment was filed, the government was aware that the defendant was in the custody of the State of Alabama on a state conviction. (Filing 1).

On July 27, 1988 the United States lodged a detainer against the defendant with the state authorities in Alabama. (Def's Exh. 1). On or about August 5, 1988 the defendant executed an acknowledgment of detainer, a demand for speedy trial, and a request that his custodian forward the demand to the appropriate United States Attorney. (Def's Exh. 2). Defendant's Exhibit 2 is a form prepared by the United States Marshal in conformity with the Interstate Agreement on Detainers. The defendant testified that he gave the document to his custodian, who should have attached a certificate of the defendant's status to the demand and then should have sent the demand to federal authorities. It appears that Defendant's Exhibit 2 was received in the office of the United States Marshal on or about August 16, 1988; however, it did not contain a certificate of the defendant's status at the Alabama institution as required by article III(a) of the Interstate Agreement on Detainers, 18 U.S.C.A. App. § 2 (1970).

On August 17, 1988 the Clerk of the United States District Court for the District of Nebraska received a handwritten pleading from the petitioner requesting, among other things, that the petitioner be tried within 180 days. (Filing 5). Attached to this pleading was a certificate of the defendant's status at the Alabama institu-

tion where he was confined, as required by article III(a) of the Interstate Agreement on Detainers. *Id.* The pleading was referred to me by the Clerk, and I entered an Order on August 23, 1988 requiring the Clerk to file the pleading and advising the United States Attorney to "take such action as is necessary, under the circumstances." (Filing 4). On February 27, 1989 the government sought and received a writ of habeas corpus ad prosequendum (filing 6) endeavoring to secure the appearance of the defendant. This writ was apparently in error, in that the defendant was not at the correctional institution to which the writ was directed. (Filing 8). Thereafter, on March 9, 1989 the government sought and obtained another writ (filing 7), the body of the defendant was obtained, and the defendant had his first appearance before me on March 21, 1989. (Filing 9).

Shortly after I entered my order of August 23, 1988, and on August 31, 1988, the Assistant United States Attorney handling this case wrote the Special Agent in Charge of the FBI office in Omaha. (Pl's Exh 1). The letter stated in part:

> We would like to know if the defendant is awaiting trial on other charges or if he is serving a sentence. It is our understanding that the defendant is located in Alabama under [a specific inmate number and in a specific place of confinement]. As the defendant has tendered a pleading asking that he be accorded his right to a speedy trial, we ask that your report be submitted as soon as possible.

(Pl's Exh. 1).

The FBI responded in writing on September 23, 1988, stating that the defendant had been convicted in state court in Alabama, was in prison in Alabama, and that Alabama authorities had advised that "the United States Attorney's Office, Omaha, Nebraska, could execute its detainer on [the defendant] by forwarding forms number 5 and 6 under the Interstate Agreement on Detainers to the [Alabama authorities]." (Pl's Exh. 2).

The Assistant United States Attorney responded in writing on September 29, 1988 asking the FBI to determine whether there were other charges pending, and "[i]f there are no other charges pending, we will take appropriate steps to remove [the defendant] to the District of Nebraska." (Pl's Exh. 3).

On November 14, 1988 the FBI responded, stating that while there were no other pending charges, local authorities in Oklahoma were investigating the defendant, and the local investigator had notified the FBI that "if [the defendant's] fingerprints are located on these checks, [the local investigator] will then apply for a warrant to be issued for [the defendant's] arrest." (Pl's Exh. 4). The FBI further advised in its November letter that the FBI was expecting a report from the local authorities on December 1, 1988.

On January 6, 1989 the Special Agent in Charge of the FBI wrote to the Assistant United States Attorney responsible for this case, summarizing two telephone conversations. Essentially, the FBI had telephone conversations with local Oklahoma authorities and learned that it would take additional time to complete the fingerprint examination, and the FBI expected to have the report by February 1, 1989. (Pl's Exh. 5). The FBI recounted that the Assistant United States Attorney had on December 1, 1988 agreed to an extension of time for the local authorities to complete the investigation, relying on the assurances of the local investigator that if the fingerprint analysis was positive the local authorities would seek a warrant.

On February 14, 1989 the Special Agent in Charge of the FBI wrote the Assistant United States Attorney handling this case and summarized a telephone conversation which the Special Agent had with the Assistant United States Attorney on February 1, 1989. Essentially, the letter recounted that "there will not ... be any local charges filed against [the defendant in Oklahoma] in the foreseeable future." (Pl's Exh. 6). The FBI had further advised that computer checks of the "wanted person files ... were negative as of February 1, 1989." (Pl's Exh. 6).

At the evidentiary hearing, the FBI special agent who testified said that the FBI

had suspected that the defendant was involved in similar fraudulent schemes throughout the country, and, because of this concern, federal authorities desired not to interfere with local prosecutions by executing upon the detainer. Apparently, federal authorities during the relevant time periods doubted their authority to release a federal pretrial detainee so that the detainee could be charged by local authorities, once the federal pretrial detainee's presence in federal custody was obtained by virtue of execution upon a federal detainer lodged against the prisoner while he was in local custody.

## II.

### A.

Article III(a) of the Interstate Agreement on Detainers provides that a prisoner against whom a detainer is lodged "shall be brought to trial within one hundred and eighty days after" he shall have given the proper notice of request for final disposition, with an accompanying certificate as specified in the Agreement. 18 U.S.C.A.App. § 2 (1970). There is no dispute that, by the latest August 23, 1989, the defendant here had complied with the notice requirements of the Agreement by virtue of his pleading filed in this case, supported by the certificate of state authorities, which pleading had been served on the government by court order. *See Gibson v. Klevenhagen*, 777 F.2d 1056, 1058 (5th Cir.1985) (stating that a *pro se* prisoner had complied with the Agreement by serving a demand on the prosecutor and filing a pleading in the court). There is further no dispute that the defendant has not been tried within the prescribed 180–

day period. The only substantive issue[1] is whether the government may excuse its failure for "good cause" shown.

The government argues that it may excuse its failure to bring the defendant to trial within 180 days because it had "good cause." The government refers me to no cases in support of its argument, and I could find none. Article V(c) of the Interstate Agreement on Detainers is unequivocal in providing for dismissal:

> [I]n the event that an action on the indictment ... on the basis of which the detainer has been lodged is not brought to trial within the period provided in article III ... the appropriate court of the jurisdiction where the indictment ... has been pending *shall enter an order dismissing the same....*

18 U.S.C.A.App. § 2 (Article V(c)) (1970) (emphasis added).

The only reference to "good cause" in the cases which is possibly supportive of the government's contention is found in *Cuyler v. Adams*, 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), where the Court, in discussing the Agreement, stated that if the prisoner complies with the Agreement, then the receiving entity "must bring him to trial within 180 days or the charges will be dismissed with prejudice, absent good cause shown." *Id.* at 444, 101 S.Ct. at 710. The *Cuyler* opinion dealt with the relationship between the Interstate Agreement on Detainers and the Uniform Criminal Extradition Act. The Court was not attempting to construe whether Article V(c) of the Interstate Agreement on Detainers was mandatory in requiring dismissal.

---

1. The Agreement binds the United States of America as well as the states, whether the federal government is the sending or the receiving entity. *United States v. Mauro,* 436 U.S. 340, 353–56, 98 S.Ct. 1834, 1843–45, 56 L.Ed.2d 329 (1978). As long as a detainer was first lodged against the defendant, the fact that the government later obtained the presence of the defendant by writ, instead of seeking temporary custody under the Agreement, does not obviate the government's obligation to comply with the deadlines contained in the Agreement. *United States v. Roy,* 771 F.2d 54, 58–59 (2d Cir.1985),

cert. denied, 475 U.S. 1110, 106 S.Ct. 1520, 89 L.Ed.2d 918 (1986). The defendant need not show prejudice to secure relief in a direct attack on his confinement. *Compare United States v. Ford,* 550 F.2d 732, 743–44 (2d Cir.1977) (not requiring prejudice in a direct attack), *aff'd sub nom. United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978) *with Young v. Mabry,* 471 F.Supp. 553, 562–63 (E.D.Ark.1978) (requiring prejudice in a collateral attack), *aff'd,* 596 F.2d 339 (8th Cir.), *cert. denied,* 444 U.S. 853, 100 S.Ct. 107, 62 L.Ed.2d 69 (1979).

■ In fact, the Agreement does speak to "good cause," but not in the context which the government suggests. The Agreement refers to "good cause" in Article III in this way: *"Provided,* That, for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance." 18 U.S.C.A.App. § 2 (1970) (Article III(a)). The Agreement contemplates a continuance of the trial deadline for "good cause" before expiration of the trial deadline; the Agreement does not contemplate that "good cause" be used as an excuse for failure to observe an uncontinued trial deadline.

I thus believe that the reference to "good cause" in *Cuyler* was a reference to an expansion of the 180–day trial deadline through the device of a continuance motion, taken up in open court, where the prisoner or his counsel are present, prior to the time the time the deadline would otherwise expire. I do not believe that the *Cuyler* opinion meant to suggest that the government could excuse its failure by showing, once the 180 days had expired, that its actions were predicated upon good cause.

This interpretation of the "good cause" language—that it permits a continuance beyond 180 days if the application for continuance is made before the deadline runs, but "just cause" may not serve as post facto justification—is consistent with *United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), where the Court was confronted with questions surrounding the applicability of the Agreement to the federal government. In discussing article III of the Agreement, the Court emphasized that "[i]f the prisoner does make such a request, the jurisdiction that filed the detainer must bring him to trial within 180 days." *Id.* at 351, 98 S.Ct. at 1842 (footnote omitted). In a footnote to the foregoing passage, the Court noted that "[f]or good cause shown in open court, with either the prisoner or his counsel present, the court having jurisdiction over the matter may grant any necessary or reasonable continuance." *Id.* at 351 n. 18,

98 S.Ct. at 1843 n. 18. And, in one of the cases which formed the basis for *Mauro* decision, the Second Circuit Court of Appeals concluded that the language of article V(c) requiring dismissal was "mandatory on th[e] court." *United States v. Ford,* 550 F.2d 732, 743–44 (2d Cir.1977), *aff'd sub nom. United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978).

Indeed, many courts have assumed without discussion that the words of the Agreement requiring dismissal simply mean what they say. *See, e.g., Gibson,* 777 F.2d at 1058 (stating that article V(c) provides for an order of dismissal if the 180–day time limit is not satisfied; accordingly, since the time limit was not satisfied in that case, dismissal was required); *United States v. Woods,* 465 F.Supp. 89, 90 (E.D.Ky.1979) (stating that once the United States files its detainer and the prisoner demands disposition, the government must " 'put up or shut up' " or suffer the consequence of having the charge dismissed and the detainer lifted), *aff'd,* 621 F.2d 844 (6th Cir.), *cert. denied,* 449 U.S. 877, 101 S.Ct. 222, 66 L.Ed.2d 99 (1980).

■ Accordingly, given the plain language of the Agreement and the absence of any authority to the contrary, I conclude that the government may not excuse its failure to try the defendant within 180 days of his demand for disposition by later attempting to establish that the government had "good cause" for its actions. I shall thus recommend dismissal.

### B.

■ My intent to recommend dismissal does not end the matter. While article V(c) of the Agreement, 18 U.S.C.A.App. § 2 (1970) requires dismissal "with prejudice," a recent amendment pertaining only to the federal government when it is the "receiving State" provides that the dismissal "may be with or without prejudice." Anti–Drug Abuse Act, Pub.L. No. 100–690, 1988 U.S. Code Cong. & Admin.News (102 Stat. 4403) (codified at 18 U.S.C.A.App. § 9(1) (Supp. 1989)).

The Amendment, 18 U.S.C.A.App. § 9(1) & (2) (Supp.1989), in its entirety states:

Notwithstanding any provision of the agreement on detainers to the contrary, in a case in which the United States is a receiving State—

(1) any order of a court dismissing any indictment, information, or complaint may be with or without prejudice. In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: The seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of the agreement on detainers and on the administration of justice; and

(2) it shall not be a violation of the agreement on detainers if prior to trial the prisoner is returned to the custody of the sending State pursuant to an order of the appropriate court issued after reasonable notice to the prisoner and the United States and an opportunity for a hearing.

*Id.*

The amendment requires an analysis of three factors: (1) the seriousness of the offense; (2) the facts and circumstances which lead to the dismissal; and (3) the impact of a reprosecution on the administration of the agreement on detainers and on the administration of justice. *Id.* These standards are essentially the same statutory standards which are applied when determining whether to dismiss a federal criminal case with or without prejudice for a violation of the Speedy Trial Act. 18 U.S.C.A. § 3162(a)(1) & (2) (1985). Accordingly, I have engaged in the same strict scrutiny of the evidence seemingly required in this Circuit of motions to dis-

miss with prejudice for violations of the Speedy Trial Act. *See United States v. Kramer*, 827 F.2d 1174, 1177–79 (8th Cir. 1987) (reversing and remanding the district court's decision dismissing with prejudice the indictment for an admitted violation of the Speedy Trial Act).

The "seriousness of the offense" standard may be judged by how the Sentencing Guidelines, 28 U.S.C.A. § 994(a) (Supp. 1989) would evaluate the charged conduct.[2] In essence, the government charges the defendant with making concerted efforts to defraud two financial institutions, which resulted in fairly small losses—more than two thousand and less than five thousand dollars total. Although the loses were small, the potential for harm was great. The schemes reflect planning such as the use of a drop box, the use of false social security numbers, the use of bank accounts in other states which had previously been closed, the use of false identification documents, such as driver's licenses, and the passage of forty-two checks in one scheme and seventy-nine checks in the other scheme. The crimes charged are considered indicative of a potential to do substantial harm by the Sentencing Commission:

The extent to which an offense is planned or sophisticated is important in assessing its potential harmfulness and the dangerousness of the offender, independent of the actual harm. A complex scheme or repeated incidents of fraud is indicative of an intention and potential to do considerable harm.... Accordingly, the guideline not only specifies a 2–level enhancement when this factor is present, but also specifies that the minimum offense level in such cases shall be 10.

United States Sentencing Commission Guidelines Manual 2.70 (Oct.1987) (Back-

---

**2.** The Guidelines became effective on November 1, 1987. 18 U.S.C. § 3551 (1981). I do not intend by these remarks to determine whether the defendant, if convicted, would be properly sentenced pursuant to the Guidelines. I refer here to the Guidelines because they represent, due to the way in which they were formulated and adopted, perhaps the most authoritative

statement as to how Congress would likely categorize the relative seriousness of offenses for which Congress has prescribed criminal penalties. Thus, since the purpose here is to ascertain the "seriousness" of the offense in general, the Guidelines are helpful whether or not the defendant would be eligible for sentencing pursuant to them.

ground to Part F—Offenses Involving Fraud or Deceit, § 2F1.1.(a) & (b)(2)).

Accordingly, I consider the charged conduct as "indicative of an intention and potential to do considerable harm," *id.*, and accordingly classify the charge as "serious" for purposes of determining whether the dismissal should be with or without prejudice.

The second category which must be examined relates to the facts and circumstances causing the dismissal. In this case the Assistant United States Attorney handling this case and the Special Agent of the F.B.I. assigned to investigate this case acted diligently. The sole and only reason for the delay was an effort by federal authorities to try to accommodate local prosecutorial authorities, because representatives of the government worried that if they took custody of the defendant, the filing and processing of state charges against the defendant might be frustrated.

The fears of the federal authorities were to a large extent justified. The Agreement contains "anti-shuttling" [3] provisions which might reasonably have been understood by the federal authorities to have prohibited the federal government from returning the defendant to Alabama custody until the defendant's federal trial was completed, thereby precluding other state authorities from promptly obtaining custody of the defendant from Alabama in order to charge him.[4] *See United States v. Schrum*, 638 F.2d 214, 215 (10th Cir.1981) (stating that the Agreement required dismissal of federal indictments where state prisoners, against whom detainers had been lodged, were taken from state custody by federal authorities, on a writ, to appear for arraignment and other pretrial proceedings but were not tried before being returned to

state custody the same day, relying upon 18 U.S.C.A. App. § 2 (1970) (Article IV(e))). Indeed, it was not until the amendment adopted in November of 1988 that federal authorities clearly had the statutory authority to return prisoners to state custody prior to a federal trial. 18 U.S.C.A. App. § 9(2) (Supp.1989) (providing that return of custody to the sending state by federal authorities prior to trial is not a violation of the Agreement if pursuant to court order after reasonable notice and opportunity for hearing). Therefore, I conclude that the government acted with a proper motive, albeit it in unintentional violation of the Agreement, and there is no significant evidence of a pattern of neglect or intentional violation of the Agreement.

Third, the court is required to examine the impact of reprosecution on the administration of the Agreement and the impact of reprosecution on the administration of justice.

There should be very little impact upon the administration of the Agreement by reprosecution in this case. Once the order of dismissal is executed by the court, the government may no longer lodge or maintain a detainer against the defendant for the instant charges, as upon dismissal of the charges—with or without prejudice—"any detainer based thereon shall cease to be of any force or effect." 18 U.S.C.A. App. § 2 (1970) (Article V(c)). The government will have to rely upon its authority to obtain the defendant for trial through the device of a writ of habeas corpus ad prosequendum. 28 U.S.C.A. § 2241 (1971).

Thus, since the detainer will no longer exist, "[w]hen the United States obtains state prisoners by means of a writ of habeas corpus *ad prosequendum,* the problems that the Agreement seeks to eliminate do

---

**3.** The Agreement, before the 1988 amendment, provided for dismissal with prejudice of an indictment if the prisoner was not tried prior to being returned to the original place of confinement. 18 U.S.C.A. App. § 2 (1970) (Article IV(e)).

**4.** The Agreement provides that authorities in other states could have asked the State of Alabama to turn the defendant over to them for

pretrial and trial purposes, 18 U.S.C.A. App. § 2 (1970) (Article IV(a)), and the State of Alabama could have consented to such temporary custody, *id.* (Article V(a)). The Agreement does not seem to authorize the "receiving State"—in this case the federal government—to grant custody to any entity other than the "sending State"—in this case Alabama.

not arise; accordingly, the government is in no sense circumventing the Agreement by means of the writ." *Mauro*, 436 U.S. at 361, 98 S.Ct. at 1848 (footnote omitted). The Agreement, of course, sought to eliminate the problems associated with detainers being lodged against inmates and the adverse impact such detainers have on the prison system, unless they are resolved with some speed. Unlike writs of habeas corpus ad prosequendum, detainers can be lodged without court supervision and never expire; this in turn may adversely impact the rehabilitation of prisoners because the prisoner and prison officials can never be certain of the inmate's status unless and until the inmate is tried on the charges underlying the detainer. *Id.* at 358–59, 98 S.Ct. at 1845–46. On the other hand, writs of habeas corpus ad prosequendum are court supervised, have limited duration, and since all prisoners are potentially subject to the writ of habeas corpus ad prosequendum, the potentiality for the issuance of the writ is not likely to adversely impact upon an individual inmate or the prison system. *Id.* at 357–61, 98 S.Ct. at 1845–48.

I also conclude that reprosecution will not adversely impact upon the administration of justice. At least at this juncture, the evidence shows very little in the way of prejudice. The only evidence of "prejudice" to the defendant is that he was denied some opportunities, due to the existence of the detainer, to participate in certain undefined prison programs (Def's Exhs. 6 and 7); this, however, is not evidence of "prejudice" resulting from the failure to bring him to trial within 180 days as provided for in the Agreement, but rather is a result of the government perfecting a perfectly proper and valid detainer. That "prejudice" will now be eliminated by the

voiding of the detainer upon issuance of this court's order. Importantly, the evidence fails to show even a possibility of prejudice arising *by virtue of the mere passage of time.*

Thus, there is no evidence before me upon which I can conclude that defendant's sixth amendment rights [5] or due process rights [6] have been impaired as of this point in time or will likely be impaired in the future by reprosecution.[7] For example, the mere passage of time from the date of demand for disposition until the first appearance—about seven months—is not alone grounds for automatic dismissal if the defendant's present motion was predicated on sixth amendment grounds. *Smith v. Mabry*, 564 F.2d 249, 251 (8th Cir.1977), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978) (stating that a ten-month delay was sufficient to trigger inquiry, but not enough to require dismissal without more). Moreover, in the Speedy Trial Act there is a provision requiring, in essence, the government to exercise reasonable efforts to undertake to obtain the presence of the defendant in circumstances such as present here or file a detainer and advise the defendant of his right to demand a trial, 18 U.S.C.A. § 3161(j)(1) (1985). Even had there been a violation of this portion of the Speedy Trial Act, such a violation would not even require dismissal pursuant to the Speedy Trial Act, *United States v. Valentine*, 783 F.2d 1413, 1415–16 (9th Cir.1986); *United States v. Anderton*, 752 F.2d 1005, 1008 (5th Cir.1985), let alone dismissal with prejudice. Accordingly, on the record presented to me, I cannot assume that the defendant has suffered prejudice.

Still further, the actions of the government, as indicated above, were not improp-

---

**5.** For the criteria to be used to evaluate a sixth amendment speedy trial claim, *see Barker v. Wingo*, 407 U.S. 514, 519–33, 92 S.Ct. 2182, 2186–94, 33 L.Ed.2d 101 (1972).

**6.** For the standard used in evaluating a due process claim arising from preindictment delay, *see United States v. Marion*, 404 U.S. 307, 313–24, 92 S.Ct. 455, 459–65, 30 L.Ed.2d 468 (1971).

**7.** Should the defendant be reprosecuted, it would appear that he would have the right to relitigate the prejudice issue, at least insofar as the issue had Constitutional dimensions. *Cf. Smith v. Hooey*, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969).

erly motivated, and there is no evidence of a pattern or practice of the government violating or neglecting the Agreement. Thus, there is no need for the court to exercise the coercive authority of dismissal with prejudice to bring the government into compliance with the Agreement.

Let me summarize. First, I find that the crime charged is serious because the Sentencing Commission believes it to be serious, and when a crime is "serious" "[a]n innocent public's interest in justice would be furthered by reprosecution in light of the serious nature of the charges." *Kramer*, 827 F. at 1179. Second, I find that the facts and circumstances giving rise to the dismissal suggest that the government was acting with a proper motive to assist other prosecutorial authorities; specifically, I find that the government's part in causing the delay was premised upon a significant and justifiable concern, to wit, whether the proper interpretation of the "anti-shuttling" provisions of the Agreement would have prohibited timely prosecution by other state authorities. Third, I find that the administration of the Agreement will not be adversely impacted by reprosecution because the detainer will be voided and the use of the writ will not cause the same problems as would a detainer. Finally, I find that administration of justice does not require dismissal with prejudice because of the relative lack of fault on the part of the government, the lack of prejudice suffered by the defendant, and the absence of a pattern or practice of intentional or negligent disregard of the Agreement by the government.

IT IS RECOMMENDED to District Judge William G. Cambridge:

1. The defendant's motion to dismiss (filing 16) be granted as provided herein;

2. The Indictment (filing 2) be dismissed without prejudice to reprosecution; and

3. The court declare and determine that the presently filed detainer and any detainer asserted for the same offenses or based upon the same conduct or arising from the same criminal episode shall cease to be of any force or effect.

DATED this 9th day of May, 1989.