August 9, 1994 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1182
No. 92-1258
UNITED STATES OF AMERICA,

Appellee,
v.

DARRYL WHITING,
a/k/a G., GOD, RAH,
Defendant, Appellant.

No. 92-1183

UNITED STATES OF AMERICA,
Appellee,

v.
SEAN DIXON,
a/k/a MICHAEL WHITE,

Defendant, Appellant.

No. 92-1184
UNITED STATES OF AMERICA,

Appellee,
v.

RENALDO PLEDGER,
a/k/a EUGENE NOBLE,
Defendant, Appellant.

No. 92-1185

UNITED STATES OF AMERICA,
Appellee,

v.
EDWIN CARMICHAEL,
a/k/a FREEDOM,

Defendant, Appellant.

No. 92-1259
UNITED STATES OF AMERICA,

Appellee,
v.

WILLIAM BOWIE,
a/k/a CUDA, DIAMOND,
Defendant, Appellant.

No. 92-1442

UNITED STATES OF AMERICA,
Appellee,

v.
STEVEN WADLINGTON,
a/k/a MOHAMMED,

Defendant, Appellant.

No. 92-1443
UNITED STATES OF AMERICA,

Appellee,
v.

KENNETH BARTLETT,
a/k/a CHEYENNE,
Defendant, Appellant.

ERRATA SHEET

The opinion of this Court, issued on July 6, 1994, is amended as
follows:

On page 32, line 9 of only full paragraph, replace the material
beginning with "If these" through "Id. at 1778-79." with the

following:

If these criteria are met, the court of appeal "has authority
to order correction, but is not required to do so," id. at

1778, and should exercise its remedial discretion only "in
those circumstances in which a miscarriage of justice would
otherwise result," or where the error "seriously affect[s]

the fairness, integrity or public reputation of judicial
proceedings." Id. at 1779 (internal quotations omitted).

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1182
No. 92-1258
UNITED STATES OF AMERICA,

Appellee,
v.

DARRYL WHITING,
a/k/a G., GOD, RAH,
Defendant, Appellant.

No. 92-1183

UNITED STATES OF AMERICA,
Appellee,

v.
SEAN DIXON,
a/k/a MICHAEL WHITE,

Defendant, Appellant.

No. 92-1184
UNITED STATES OF AMERICA,

Appellee,
v.

RENALDO PLEDGER,
a/k/a EUGENE NOBLE,
Defendant, Appellant.

No. 92-1185

UNITED STATES OF AMERICA,
Appellee,

v.
EDWIN CARMICHAEL,
a/k/a FREEDOM,

Defendant, Appellant.

No. 92-1259
UNITED STATES OF AMERICA,

Appellee,
v.

WILLIAM BOWIE,
a/k/a CUDA, DIAMOND,
Defendant, Appellant.

No. 92-1442

UNITED STATES OF AMERICA,
Appellee,

v.
STEVEN WADLINGTON,
a/k/a MOHAMMED,

Defendant, Appellant.

No. 92-1443
UNITED STATES OF AMERICA,

Appellee,
v.

KENNETH BARTLETT,
a/k/a CHEYENNE,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Walter Jay Skinner, U.S. District Judge]

Before

Breyer,* Chief Judge,

Boudin and Stahl, Circuit Judges.

*Chief Judge Stephen Breyer heard oral argument in this matter, but
did not participate in the drafting or the issuance of the panel's
opinion. The remaining two panelists therefore issue this opinion
pursuant to 28 U.S.C. 46(d).

Gary C. Crossen, by Appointment of the Court, and Stephen D.

Sowle with whom Sarah Reed, John A. Shope and Foley, Hoag & Eliot were

on briefs for appellant Darryl Whiting.
John H. LaChance, by Appointment of the Court, with whom LaChance

and Whatley was on briefs for appellant Sean Dixon.

John C. Doherty, by Appointment of the Court, for appellant

Renaldo Pledger.
Janet L. Sanders with whom Zalkind, Rodriguez, Lunt & Duncan was

on briefs for appellant Steven Wadlington.
Lois Lewis, by Appointment of the Court, for appellant Edwin

Carmichael.
John P. Slattery, by Appointment of the Court, with whom Wysocki

and Slattery was on brief for appellant Kenneth Bartlett.

Paul A. Dinsmore, by Appointment of the Court, for appellant

William Bowie.
Robert W. Iuliano, Assistant United States Attorney, Paul V.

Kelly, Assistant United States Attorney, (for IAD issue), and Thomas

C. Frongillo with whom Donald K. Stern, United States Attorney, was on

briefs for the United States.

July 6, 1994

BOUDIN, Circuit Judge. These cases arise out of an

extensive undercover law enforcement operation targeted at

the "New York Boys," a large-scale drug distribution ring

operating out of the Orchard Park Housing Project in Roxbury,

Massachusetts. The seven defendants currently before the

court appeal their convictions, their sentences, or both. We

affirm the district court's rulings on all but one point.1

I.

On December 11, 1990, a federal grand jury indicted

Darryl Whiting, Sean Dixon, Renaldo Pledger, Edwin

Carmichael, and Steven Wadlington--as well as 26 co-

defendants--for conspiracy to distribute cocaine in violation

of 21 U.S.C. 846. A superseding indictment returned on

April 11, 1991, expanded the case to include a total of 50

defendants, including Kenneth Bartlett and William Bowie.

The individual defendants were also charged with various

combinations of substantive cocaine distribution, 21 U.S.C.

841(a)(1), firearms offenses, 18 U.S.C. 922(g)(1); 26

U.S.C. 5861(d), or money laundering, 18 U.S.C.

1956(2)(1), and Whiting was alleged to be the organizer and

1The published version of this opinion includes only the
statement of facts (part I) and the discussion of those
issues that may be of general interest (parts II and III).
The remaining portions of the opinion as filed (parts IV-VI)
address issues that do not appear to have precedential
importance. See First Cir. R. 36.2.

-8-

supervisor of a continuing criminal enterprise in violation

of 21 U.S.C. 848.

Rather than try 50 defendants at once, the district

court severed the case into smaller cases. The first five

defendants named above ("the first-trial defendants") were

placed in the initial trial group, along with a sixth defen-

dant (David Waight) who has not appealed. Trial began on

June 17, 1991, and continued for 18 days spread over the next

four weeks. The evidence consisted primarily of the

testimony of undercover agents and cooperating co-defendants.

Taken in the light most favorable to the government, United

States v. Gonzalez-Torres, 980 F.2d 788, 789 (1st Cir. 1992),

the evidence showed the following:

The first-trial defendants, together with many other

individuals, were members of or associated with the "New York

Boys," a street gang headed by Whiting and operating out of

the Orchard Park Housing Project in Roxbury, Massachusetts.

The gang was so named because many of its members hailed from

Queens, New York. During the period from 1986 to 1990, the

New York Boys evolved into a large, highly structured

organization that employed up to 100 different people and

sold cocaine and cocaine base ("crack" cocaine) in shifts 24

hours a day.

The Whiting organization received its cocaine from New

York City. A number of couriers transported the drugs to

-9-

Boston on airline shuttles. The drugs were then processed--

"cut" with dilutants and divided into individual bags--at

several different apartments located outside the Orchard Park

Project. Finally, the cocaine was sold at Orchard Park

through an elaborate network of personnel: "runners" who met

customers and took their money; other individuals who

"worked the pack" by holding small quantities of cocaine and

distributing it to incoming runners in exchange for cash;

and a third group who held larger inventories of cocaine

packs in more secure locations and periodically resupplied

those "working the pack." Additional workers served as

lookouts for police or provided security against rival gangs.

During the organization's most prosperous period, the New

York Boys sold as much as five kilograms of cocaine per week,

grossing up to $100,000 in a single half-day shift.

The organization sent substantial sums out of Boston via

Western Union, giving rise to money-laundering charges

against Whiting and Carmichael. Many of the workers were

paid up to $1,000 per week for their services, although not

consistently. Whiting invested funds in various Roxbury

businesses, including a barber shop, video store, and the

Crown Social Hall. Although this hall functioned as a

community center, it also served as a front for drug

distribution activities and a means of laundering the

proceeds of drug sales. Whiting also sponsored rap concerts,

-10-

barbecues, and other social events, and provided gifts of

clothing and money to youth in the Roxbury community.

The government's witnesses testified about numerous

weapons possessed by defendants and acts of violence done to

maintain discipline within the organization and security vis-

a-vis rival gangs. Security measures were elaborate: gang

members were equipped with binoculars, walkie-talkies, and

headphones and had ready access to firearms ranging from riot

pump shotguns to Uzi machine guns. There was extensive

evidence of beatings and other acts of violence against

members of the organization who stole money or cocaine,

attempted to sell drugs on their own, or otherwise disobeyed

orders.

The first-trial defendants mounted a defense consisting

primarily of attacks on the credibility of the government's

witnesses. Defense counsel attacked the testimony of one of

the government's two primary undercover operatives, Jeffrey

Coy, by emphasizing instances in which Coy had failed to

follow proper police procedures and by showing that Coy had

suffered serious psychological and emotional problems during

and after the investigation. Defendants also sought to

undermine the second undercover agent, Maurice Dawkins, by

way of testimony from a former supervisor that Dawkins was

not "a man of truth." Defense counsel also won admissions

that many of the cooperating co-defendants who testified had

-11-

drug problems, and that some would be willing to lie to

further their own interests. Whiting himself testified that

he was not involved in drug dealing and that his income came

from legitimate business activities.

On July 24, 1991, the jury convicted Whiting of one

count of engaging in a continuing criminal enterprise, 21

counts of distribution of cocaine, and one count of money

laundering; he was acquitted of two counts of distribution of

cocaine.2 Dixon, a runner and security worker, was

convicted of conspiracy to distribute cocaine and of one

substantive distribution count, but was acquitted on an

additional distribution count. Pledger, another security

worker, was convicted on the conspiracy count and on one

count of being a felon in possession of a firearm. Edwin

Carmichael, who had a managerial role, was convicted of

conspiracy to distribute cocaine and of one count of money

laundering. Steven Wadlington, a security worker, was

convicted on the conspiracy count and of one count each of

distribution of cocaine and possession of an unregistered

firearm; he was acquitted on two additional distribution

counts.

2Whiting was also convicted of conspiracy to distribute
cocaine; the district court, however, vacated that count on
the ground that it was a lesser included offense subsumed
within the continuing criminal enterprise conviction.

-12-

Sentences were imposed on October 7, 21, and 22, 1991,

and the five defendants filed timely notices of appeal. The

specific sentences imposed were as follows:

Darryl Whiting Life without parole on the continuing
criminal enterprise count; 240 months
imprisonment for each of 21 distribution
counts and one money laundering count, to
be served concurrently; and a $1200
special assessment.

Sean Dixon 188 months imprisonment and 60 months
supervised release on the conspiracy
count; 60 months imprisonment for
distribution count, to run concurrently;
and a $100 special assessment.

Renaldo Pledger 235 months imprisonment and 60 months
supervised release; and a $100 special
assessment.

Edwin Carmichael 262 months imprisonment and 60 months
supervised release; and a $100 special
assessment.

Steven Wadlington 360 months imprisonment on the conspiracy
count and 60 months supervised release;
240 months imprisonment on distribution
count; 120 months imprisonment on the
firearms count, all sentences to run
concurrently; and a $150 special
assessment.

Bartlett and Bowie were among six co-defendants slated

for trial in the second group created by the district court.

Both Bartlett and Bowie were alleged to have served as

security workers. Bowie, the government claimed, acted as

the chief of security for the organization and as Whiting's

bodyguard. The second trial commenced on November 19, 1991.

On the sixth day of trial, Bartlett and Bowie pled guilty to

conspiracy to distribute cocaine.

-13-

Bowie was sentenced on February 10, 1992, to 262 months

imprisonment and 60 months supervised release, as well as a

$50 special assessment. Bartlett was sentenced on March 11,

1992, to an identical sentence; in his case, however, the

district court ordered that the sentence be served

consecutively to two previously imposed state sentences for

second degree murder and firearms charges. Bowie and

Bartlett have each appealed from their sentences, and Bowie

has challenged the validity of his guilty plea as well.

II.

We consider first several arguments jointly presented by

the first-trial defendants: Whiting, Dixon, Pledger,

Carmichael, and Wadlington. Each asserts that the district

court erred in refusing to permit certain testimony aimed at

undermining the credibility of one of the government's

undercover operatives; in allowing the prosecutor to make

allegedly inflammatory remarks to the jury; in mischarging

the jury on the definition of "reasonable doubt"; and in

calculating the amount of cocaine for which the defendants

were held accountable at sentencing. Although none of these

arguments is frivolous, we do not find any of them ultimately

persuasive.

A. Impeachment of Anthony Hewitt

A key government witness at trial was Maurice Dawkins,

an undercover operative who made a total of 11 purchases of

-14-

cocaine from various members of the Whiting organization.

Many of Dawkins' dealings were uncorroborated by tape

recordings or other witnesses; as a result, his credibility

became a central issue at trial. In an attempt to undermine

Dawkins, the defendants called as a witness Anthony Hewitt, a

deputy superintendent of the Jamaican Constabulary and

Dawkins' former commanding officer. Hewitt testified that,

in his opinion, Dawkins was not a truthful individual and had

a reputation for untruthfulness in Jamaica.

Fed. R. Evid. 608(b) provides that "[s]pecific instances

of the conduct of a witness, for the purpose of attacking or

supporting the witness' credibility, . . . may not be proved

by extrinsic evidence." Accordingly, defense counsel

confined themselves to eliciting from Hewitt his general

opinion of Dawkins' truthfulness and the general reputation

for truthfulness that Dawkins had among his co-workers in

Jamaica. See Fed. R. Evid. 608(a). On cross-examination of

Hewitt, the government elicited testimony regarding specific

instances of Dawkins' good conduct: in particular, Hewitt

was led to acknowledge various commendations that Dawkins had

received while on the Jamaican force, as well as the fact

that Dawkins had been injured in the line of duty.

On redirect examination, the defense sought to question

Hewitt about specific instances in which Hewitt and other

members of the Jamaican Constabulary had found Dawkins to be

-15-

not credible.3 Defense counsel argued that the government

had "opened the door" by eliciting testimony of specific acts

of good character on cross-examination, but the trial judge

refused to permit such testimony in light of Rule 608(b). In

this court defendants repeat their claim under the rubric of

"curative admissibility," which holds that "a trial judge, in

his discretion, [may] admit otherwise inadmissible evidence

in order to rebut prejudicial evidence which has already been

erroneously admitted." United States v. Nardi, 633 F.2d 972,

977 (1st Cir. 1980) (citations omitted).

The defendants are mistaken in assuming that the

government's evidence of Dawkins' good character was

erroneously admitted. It is quite true that the government's

evidence (of Dawkins' courage and good conduct) was not

admissible under Rule 608(b) to accredit Dawkins because the

episodes related only to Dawkins' general good character and

not to his character for truthfulness. But by its own terms

Rule 608(b) imposes its restriction only upon evidence that

is offered for the purpose of buttressing credibility; it

does not forbid evidence that happens to show good character

3Specifically, the defense sought to introduce through
Hewitt evidence that Dawkins had falsely reported that he was
the victim of a shoot-out in 1987, and that Dawkins had been
the subject of at least four civilian complaints of abuse and
assault which he had denied but which the Jamaican
Constabulary had deemed credible.

-16-

but is offered for another legitimate purpose. See United

States v. Abel, 469 U.S. 45, 55-56 (1984).

Here, the government's exploration of Dawkins' record

served two quite different purposes. First, the prosecutor

sought to test Hewitt's familiarity with Dawkins' record, the

inference being that Hewitt's own opinion and his report as

to Dawkins' reputation were themselves untrustworthy if

Hewitt knew little about Dawkins. Michelson v. United

States, 335 U.S. 469, 480 (1948). Second, by showing

Dawkins' exemplary record, the prosecutor aimed to raise

doubts about Hewitt's own motive in testifying against a

fellow officer with a good record, and thus to impute

prejudice to Hewitt. See Abel, 469 U.S. at 51.

In some instances, the permissible inferences might be

offered merely as pretext to smuggle in an impermissible one.

But in this case, the government's first justification is

ample and the second, if thinner, is at least plausible.

Defendants would have been entitled, had they asked for it,

to an instruction limiting the jury's use of the government

evidence to these lines of inference and advising the jury

that it was not entitled to infer Dawkins' character for

truthfulness from his general good character. Accordingly,

the doctrine of curative admissibility has no role in this

case because there was no error to be cured.

-17-

One could defend the admissibility of the bad character

evidence in question by saying that just as the government

used evidence of Dawkins' good character to impugn Hewitt's

motive, evidence of Dawkins' bad character would tend to

lessen doubts about Hewitt's readiness to testify against a

former fellow officer. But the bad character evidence was

not offered on this ground, and explaining the purpose for

which disputed evidence is offered is normally required to

preserve the issue on appeal. Tate v. Robbins & Myers, Inc.,

790 F.2d 10, 12 (1st Cir. 1986). A general reference to

"fighting fire with fire" is hardly much help to a district

judge trying to make on-the-spot rulings in the middle of a

hectic trial.4

B. Prosecutor's Rebuttal Argument

Defendants' second set of arguments revolves around four

remarks made by the prosecutor in his rebuttal argument to

the jury at the close of the trial. We have taken

allegations of such prosecutorial overreaching seriously in

this circuit, e.g., Arrieta-Agressot v. United States, 3 F.3d

525 (1st Cir. 1993); United States v. Santana-Camacho, 833

4There was no miscarriage of justice on this point. The
inference that Hewitt was biased is not a very strong one.
Similarly, evidence of Dawkins' bad character to refute the
bad-motive inference is not very telling; indeed, such
evidence could help to establish Hewitt's bias as well as to
refute it.

-18-

F.2d 371 (1st Cir. 1987), but in this case none of the

remarks warrants reversal of appellants' convictions.

The first remark complained of was the prosecutor s

statement that "[Darryl Whiting] also brought the kids of

Roxbury the guns, the drugs, the violence," followed by an

exhortation to the jurors not to "let other kids be succored

[sic] in by that flash, that cash, that deception." This

statement was prejudicial, defendants argue, because "it

sought to deflect [the jurors ] attention from the issues

that they were sworn to decide, . . . and attempted to foist

onto the jury responsibility for the extra-judicial

consequences of a not guilty verdict." We agree that the

"other kids" reference was improper, for "[t]he prosecutor

should refrain from arguments [predicting] the consequences

of the jury's verdict." American Bar Association, Standards

Relating to the Administration of Criminal Justice 3-5.8(d).

In this case defense counsel failed to object at the

time the allegedly prejudicial statement was made, so we

review only for plain error. Arrieta-Agressot, 3 F.3d at

528. Courts are reluctant to find such error where the

prosecutor s remarks were isolated and made to rebut specific

statements by defense counsel. See United States v. Machor,

879 F.2d 945, 956 (1st Cir. 1989), cert. denied, 493 U.S.

1081 (1990). Here, the prosecutor was clearly responding to

defense counsel's portrayal of Whiting as a philanthropist

-19-

and benefactor of Roxbury's youth, and defendants do not

point to other like instances of rhetorical excess. We do

not believe that the prosecutor's remarks "so poisoned the

well that the trial s outcome was likely affected." Arrieta-

Agressot, 3 F.3d at 528.

Defendants next object to the prosecutor's assertion

that defendants closing arguments were "smoke screens

floated your way by defense counsel . . . [who are] very able

people here." This statement, defendants argue, "sought to

convince the jury that the arguments of defense counsel were

. . . manufactured by able lawyers seeking to hide the truth

from the jury." We agree that the prosecutor should have

focused on the merits of the defendants' arguments rather

than their source. Again, defense counsel failed to object

to the statement at trial, and we have little trouble in

holding that this isolated misstep did not rise to the level

of plain error.

Defendants did object to the third allegedly offensive

statement, arguing that the prosecutor improperly placed his

own character at issue when he said that "[a]n attack on me

and my colleagues and our ethics and our approach to this

case not only [is] an affront to me personally, but a smoke

screen." Although a prosecutor may not pledge his own

character as a basis for inferring the defendant s guilt, see

United States v. Garza, 608 F.2d 659 (5th Cir. 1979), the

-20-

statement in this case referred to the government's conduct

of its investigation, not the guilt or innocence of the

defendants. The prosecutor's isolated remark responded to

far harsher remarks of defense counsel that the government

had suborned perjury. Finally, the trial judge properly

instructed the jury to disregard the prosecutor's statement

that he felt affronted. See United States v. Moreno, 991

F.2d 943, 948 (1st Cir.), cert. denied, 114 S. Ct. 457

(1993).

Defendants' final claim concerns a government chart

showing the organizational structure of the New York Boys

and, specifically, listing Dixon as a processor and packager

of cocaine. The evidence showed Dixon instead to be a runner

and, when Dixon's counsel seized on the discrepancy in his

closing argument, the prosecutor in rebuttal told the jury

that the reference on the chart was a typographical error

arising from the presence of another defendant with the same

last name. Defendants' objection that this was "extra

judicial testimony" by the prosecutor may be technically

correct, but the prosecutor's misstep was a trivial one--

serving in part to correct an overstatement of Dixon's role--

and it certainly did not cause substantial prejudice.

C. Reasonable Doubt

-21-

Defendants objected to the trial court's instruction to

the jury on the meaning of reasonable doubt, whose core was

the following paragraph:

Now, reasonable doubt is not a fanciful doubt, nor
a whimsical doubt, nor a doubt based on conjecture,
but is a doubt based on reason, as the name
implies. The government is not required to
establish guilt to a mathematical certainty or to a
scientific certainty. The government is not
required to exclude every other remote possibility.

This circuit has repeatedly refused to require the

district courts to define "reasonable doubt" in their

instructions to the jury. E.g., United States v.

Littlefield, 840 F.2d 143, 146 (1st Cir.), cert. denied, 488

U.S. 860 (1988). Where the district court does define the

term, we have suggested that "attempts at definition should

not stray far from the consistently approved stock of charges

on reasonable doubt." Id. at 646. We have left to the trial

judge, however, "the choice among acceptable linguistic

alternatives." Tsoumas v. State of New Hampshire, 611 F.2d

412, 414 (1st Cir. 1980).

The phrases employed in the paragraph quoted above are

stock phrases and the defendants do not challenge most of

them individually. They do assert that to call reasonable

doubt "a doubt based on reason" is at odds with the Supreme

Court's postulate that a reasonable doubt need not be

articulable or even logical so long as it appeals to common

sense. See Harris v. Rivera, 454 U.S. 339, 347 (1981). We

-22-

think that this argument rests on too fine a distinction and

that a "doubt based on reason"--a phrase approved by this

circuit on a number of occasions, e.g., United States v.

DeVincent, 632 F.2d 147, 152 (1st Cir.), cert. denied, 449

U.S. 986 (1980)--is not a bar against using common sense but

merely contrasts "reason" with "fancy," "whim," or

"conjecture."

Defendants' main objection is that the district court's

emphasis on what is not a reasonable doubt so far outweighs

its statement of what is a reasonable doubt as to lead the

jury to concentrate overmuch on the former. By itself, the

concept of proof "beyond a reasonable doubt" gives the

defendant a substantial advantage, which is why defense

counsel so often repeat those words in summation. Although

the advantage is a legitimate one, it does not seem to us one

that is likely to be undermined by an instruction that with a

few general phrases indicates that not every doubt is a

reasonable one.

In any event, elsewhere in the charge the court in this

case reminded the jury, in connection with the presumption of

innocence, that a defendant is never to be convicted "on the

basis of mere conjecture, surmise or guesswork." In other

words, the jury was told that just as a fanciful doubt should

not stand in the way of conviction, so too a reasonable doubt

could not be papered over by conjecture, surmise or

-23-

guesswork. Taking the reasonable doubt instruction "in the

context of the overall charge," Cupp v. Naughten, 414 U.S.

141, 146-47 (1973), we think that the charge here was

adequately balanced.

D. Calculation of Drug Quantity

Because defendants were convicted of conspiracy to

distribute cocaine, they were held responsible at sentencing

for "drugs [they] personally handled or anticipated handling,

and, under the relevant conduct rubric, for drugs involved in

additional acts that were reasonably foreseeable by [them]

and were committed in furtherance of the conspiracy." United

States v. Sepulveda, 15 F.3d 1161, 1197 (1st Cir. 1993),

cert. denied, 1994 U.S. Lexis 4738 (June 20, 1994). Based on

the government's evidence at trial, the district court

estimated that the Whiting organization distributed two

kilograms of cocaine per week over a period of three years.

Defendants now challenge this calculation, arguing that the

district court based its estimate on unreliable evidence and

improper extrapolation.

We review factual findings by the sentencing court as to

drug quantity only for clear error. Sepulveda, 15 F.3d at

1196. "[T]he sentencing court has broad discretion to

determine what data is, or is not, sufficiently dependable to

be used in imposing sentence," United States v. Tardiff, 969

F.2d 1283, 1287 (1st Cir. 1992), and we defer to any

-24-

credibility determinations by the sentencing court. United

States v. Brewster, 1 F.3d 51, 54 (1st Cir. 1993). The

burden is on the government to prove drug quantity by a

preponderance of the evidence. United States v. Valencia-

Lucena, 988 F.2d 228, 232 (1st Cir. 1993).5 Because of the

impact of quantity on the length of sentence, we have said

that in resolving doubts the sentencing court must "err on

the side of caution." United States v. Sklar, 920 F.2d 107,

113 (1st Cir. 1990).

The district court estimated that the New York Boys

distributed an average of two kilograms of cocaine per week

over the three-year life of the conspiracy. This estimate

was based primarily upon general comments by various

defendants estimating average volumes of business. These

estimates were then corroborated by reports from cooperating

co-defendants that particular quantities of cocaine were

handled at particular times, controlled buys by government

undercover operatives, and evidence indicating the size and

scope of the organization itself.

5Defendants argue that, due to the critical impact of
drug quantity on a defendant's sentence, due process requires
proof of such quantities by clear and convincing evidence,
rather than a mere preponderance. This argument was not
raised below and, in any event, is foreclosed by circuit
precedent. See, e.g. United States v. Lowden, 955 F.2d 128,

130 (1st Cir. 1992). See also McMillan v. Pennsylvania, 477

U.S. 79, 91-93 (1986) (holding that a "preponderance standard
satisfies due process" at sentencing).

-25-

Thus, Dawkins testified at trial to a conversation he

had with Steven Wadlington on November 6, 1990. Dawkins

asked Wadlington how much cocaine the New York Boys sold per

week, to which Wadlington replied: "[i]n a slow week, we

sell two and a half kilos. In a fast week, four kilos. . . .

We do this a long time."6 A second estimate was made by

Ansur Adams, a gang member who was allegedly responsible for

processing the cocaine. Adams testified that in August and

September of 1990 (the year in which he was involved in the

conspiracy), the Whiting organization sold between two and

three kilograms of cocaine per week. Adams also testified

that Jon James, one of the organization's alleged

supervisors, told him that the New York Boys "used to move

five ki's [sic] a week before [Adams] came."

These broad estimates were consistent with reports of

quantities handled by various gang members. For example,

Tony Samuels testified that the organization sold an average

of ten $40 bags and seven $60 bags of cocaine in a 12-hour

shift. There was testimony that a $60 bag contained

approximately 1.5 grams of cocaine; accordingly, Samuels'

6Defendants complain that much of Dawkins' testimony was
hearsay. The guidelines provide, however, that "[a]t
sentencing, the district court may consider `relevant
information without regard to its admissibility under the
rules of evidence applicable at trial, provided that the
information has sufficient indicia of reliability to support
its probable accuracy.'" United States v. Valencia-Lucena,

988 F.2d 228, 232 (1st Cir. 1993) (quoting U.S.S.G.
6A1.3(a)).

-26-

testimony indicates sales of roughly 410 grams per shift and

up to 5.74 kilograms per week. Rochelle Burden testified

that each apartment used as a base of sales operations was

able to sell a pack of twenty $60 bags every two hours, which

supports a figure of 360 grams of cocaine a day and

approximately 2.52 kilograms per week per apartment (several

apartments were in use at any given time). Wayne Ruff

testified that, when running money during a typical shift, he

generally delivered the proceeds of five packs of $60 bags to

his supervisor; at 30 grams per pack, this figure translates

into 300 grams per day or 2.1 kilograms per week. The

government notes, moreover, that it is unlikely that Ruff was

the only runner.

In magnitude these estimates are generally in accord

with one another (the only divergent testimony--from Lonnie

Avant--suggested an even larger average figure). The

estimates are also buttressed by testimony about the

organization's impressive scope: there was evidence that it

employed at least eight different women as couriers who

sometimes made multiple trips per week, carrying anywhere

between 125 grams and one kilogram each trip, that selling

activities were conducted 24 hours per day, seven days a

week, that eleven different apartments were used to sell or

store cocaine, and that 50 to 100 different people

-27-

participated in distribution activities over the course of

the conspiracy.

Defendants assert that the information upon which the

court relied was inherently unreliable for various reasons--

principally that much of it came from cooperating co-

defendants who admitted they would lie in order to advance

their own interests, and that the statements made to

undercover operatives could be construed as exaggerated

"puffing." The district court, however, has wide discretion

in determining what evidence is sufficiently reliable to use

at sentencing, see Tardiff, 969 F.2d at 1287, and we will not

disturb the court's finding that the government's witnesses

were credible. Brewster, 1 F.3d at 54. Further, the

estimates were largely consistent and, as we explain below,

the district court's ultimate finding was quite conservative.

Defendants' more serious contention is that the evidence

produced by the government and relied upon by the sentencing

court focused mainly upon the last year of conspiracy. It is

inherently speculative, defendants argue, to derive from this

evidence estimates of the total amount of cocaine handled by

the conspiracy over its three-year existence. We agree that

special care may be needed where evidence of quantities in

one period is extrapolated to fill gaps in evidence as to

other periods. But while the organization's sales here

varied over time, there was at least some evidence for

-28-

earlier periods and the court's conservative estimate left a

fair margin of safety.

First, some of the evidence here did deal with periods

prior to 1990, the last year of the conspiracy. Adams

reported that, according to Jon James, the organization

distributed five kilograms of cocaine per week prior to 1990.

Much of the corroborating anecdotal testimony came from gang

members--Burden, Ruff, Avant, and Michael Wilson--who joined

the conspiracy in 1987 or 1988. Their evidence, already

summarized, was not limited to the final year of the

conspiracy.

Second, following our directive to "err on the side of

caution," Sklar, 920 F.2d at 113, the district court held the

organization accountable for two kilograms of cocaine per

week over the life of the conspiracy--still an impressive sum

but less than Wadlington told Dawkins the New York Boys sold

in a "slow week" in 1990 and less than half what James

reported selling prior to that year. Moreover, because of

the breadth of the relevant sentencing categories, we need

only find that the evidence supported a 1.5 kilogram per week

figure in order to uphold all of the sentences in this

case.7 United States v. Bradley, 917 F.2d 601, 604 (1st

7This is so of Dixon, who was involved for approximately
104 weeks and was sentenced at level 38, which has a 150
kilogram threshold. U.S.S.G. 2D1.1(c)(3). In the case of
Whiting, Carmichael, Wadlington and Pledger, one kilogram per
week would be adequate for their respective sentencing

-29-

Cir. 1990). All of the general estimates in the record, as

well as the corroborating testimony as to amounts handled at

particular times, refer to quantities well in excess of one

kilogram per week.

III.

In addition to the arguments raised jointly by the trial

defendants, each of the seven defendants who have appealed in

this case has advanced one or more claims of error unique to

his individual case. Although we have dealt with most of

these contentions in the unpublished portion of this opinion,

a few are of sufficient general interest to warrant

discussion here.

A. Darryl Whiting

Whiting, the ringleader of the "New York Boys"

organization, was convicted on one count of engaging in a

continuing criminal enterprise, on 21 counts of cocaine

distribution, and on one count of money laundering. At the

time of his indictment, Whiting was serving a state prison

sentence in Massachusetts. His presence at his federal trial

was secured through use of the IAD, which permits a state

with charges outstanding against a prisoner of another state

thresholds. Id. at 2D1.1(c)(3), (4)-(5). Because the

first-trial defendants were all sentenced in October of 1991,
we apply the 1990 version of the guidelines. Isabel v.

United States, 980 F.2d 60, 62 (1st Cir. 1992). Although

Bowie was sentenced later and was subject to the 1991
guidelines, the relevant provisions were not altered in the
later edition.

-30-

to take custody of that prisoner for the time necessary for

trial.8 His principal argument on appeal is that delays in

bringing him to trial violated his rights under the IAD.

The IAD requires that where the detainer process is

initiated by the receiving state rather than the prisoner,

trial must begin within 120 days of the prisoner's arrival in

the receiving state. IAD art. IV(c). There are two

exceptions to this rule. Article VI provides that the IAD's

speedy trial provisions will be tolled "whenever and for as

long as the prisoner is unable to stand trial." IAD art.

VI(a). In addition, Article IV(c) allows that "for good

cause shown in open court, . . . the court . . . may grant

any necessary or reasonable continuance."

The parties appear to agree that in this case the IAD's

speedy trial clock began to run on December 21, 1990, when

Whiting made his initial appearance in federal court, and for

purposes of this case we adopt this starting point. At a

second hearing on December 27, Whiting (now accompanied by

counsel) refused to waive his rights under the IAD. On April

3, 1991, shortly before the 120 day period was to expire, the

8The IAD is the Interstate Agreement on Detainers, 18
U.S.C. App. II. The federal jurisdiction of the United
States is considered to be another "state" for IAD purposes.
IAD art. II. Because the IAD is a congressionally-sanctioned
compact within the Compact Clause, U.S. Const. Art. I, 10,
cl. 3, its construction is exclusively a matter of federal
law. Carchman v. Nash, 473 U.S. 716, 719 (1985); Cuyler v.

Adams, 449 U.S. 433, 438-42 (1981).

-31-

government moved for a continuance as well as a finding that

the IAD had been tolled by Whiting's filing of various pre-

trial motions. After a hearing, the district court accepted

the government's tolling argument and found that the speedy

trial period would not expire until June 12, 1991, at the

earliest. In the alternative, the court found that there was

good cause for a continuance.

On June 13, 1991, Whiting moved for dismissal of the

federal indictment for violation of his rights under the IAD.

The district court orally denied this motion on the first day

of trial--June 17, 1991--finding that an additional pretrial

motion filed by Whiting had tolled the IAD clock for another

34 days. Whiting now appeals from the trial court's denial

of his motion to dismiss. We affirm the district court and

hold that (1) the IAD clock was stopped and (2) in any event

there was good cause for a continuance.

1. The courts of appeals are divided as to the proper

construction of the IAD's Article VI tolling provision.

Whiting urges us to follow the Fifth and Sixth Circuits,

which have construed that provision narrowly and held that

the phrase "unable to stand trial" refers only to physical or

mental incapacity. See Birdwell v. Skeen, 983 F.2d 1332,

1340-41 (5th Cir. 1993); Stroble v. Anderson, 587 F.2d 830,

838 (6th Cir. 1978), cert. denied, 440 U.S. 940 (1979). We

are precluded from adopting the narrow reading advocated by

-32-

Whiting by our own prior decisions in United States v.

Walker, 924 F.2d 1 (1st Cir. 1991), and United States v.

Taylor, 861 F.2d 316 (1st Cir. 1988). These decisions,

consistent with the predominant view among circuits, held

generally that "a defendant waives the 120-day limitation

during the time it takes to resolve matters raised by him."

Taylor, 861 F.2d at 321 (citation omitted).9 Taylor held

out the possibility that the time involved in disposing of a

motion might not all be excluded where the defendant timely

advised the district court that he or she claimed the

protection of the IAD and the district court then took more

time than was necessary to resolve the motion. In this case,

Whiting did formally invoke the IAD's protection at his

second hearing, but the district court also found that

Whiting and his counsel made a "tactical decision" thereafter

to ignore the issue.

In all events Whiting offers no specifics that would

lead us to conclude, in this extremely complex and burdensome

case, that the district court was slothful in acting on

defense motions. Further, based on the rationale of Taylor

9The Second, Fourth, Seventh, and Ninth Circuits are in
accord. United States v. Scheer, 729 F.2d 164, 168 (2d Cir.

1984); United States v. Hines, 717 F.2d 1481, 1486-87 (4th

Cir. 1983), cert. denied, 467 U.S. 1214, 1219 (1984); United

States v. Nesbitt, 852 F.2d 1502, 1516 (7th Cir. 1988), cert.

denied, 488 U.S. 1015 (1989); United States v. Johnson, 953

F.2d 1167, 1172 (9th Cir.), cert. denied, 113 S. Ct. 226

(1992).

-33-

we hold that the time excluded includes time explicitly

granted to Whiting for the preparation of pretrial motions.

See Nesbitt, 852 F.2d at 1514 (so holding under the Speedy

Trial Act). Finally, we reject Whiting's fall-back position

that time spent on non-dispositive motions (here, for

discovery and exculpatory evidence) should be treated

differently than dispositive motions; both types are likely

to delay trial and both should be treated the same under

Taylor.10

2. Alternatively, we find that there was good cause in

this case for a continuance under Article IV(c) of the IAD.

We have held that a continuance granted under the Speedy

Trial Act--a statute that is, if anything, more restrictive

of ad hoc continuances--will be reversed only for an abuse of

discretion. United States v. Pringle, 751 F.2d 419, 429 (1st

Cir. 1984). In the present case, the district court rested

its finding of good cause on three primary grounds: the

"inherent complexity of this case, [and] the existence of co-

defendants and their pending motions," and the fact that some

of Whiting's co-defendants remained at large.

These reasons are ones that are recognized as bases for

continuance in the Speedy Trial Act. See 18 U.S.C.

10Neither Taylor nor Walker concerned motions that were

formally dispositive, nor does the distinction urged comport
with the statutory criterion ("unable to stand trial") that
is construed in Taylor and Walker.

-34-

3161(h)(7) (joinder with codefendant whose time has not run),

3161(h)(8)(B)(ii) (complexity; number of defendants). Here,

the court was confronted with a case initially embracing over

50 defendants--some still at large--and a range of different

charges and issues. To move Whiting's case (and that of five

co-defendants) from the assumed starting point to trial in

just under six months was no mean feat.

Further, even if we followed the Fifth and Sixth Circuit

approach and held that Whiting's pretrial motions did not

automatically toll the running of the time period, we would

hardly ignore them in deciding whether a continuance of about

58 days was reasonable. Here, Whiting did file various

pretrial motions, as did other of the first-trial co-

defendants; and, as noted, there is no showing that the

district court unreasonably delayed in acting upon them.

Whatever the limitations on delaying a trial, Whiting's case

does not even arguably test them.

B. Steven Wadlington

Wadlington was an employee of the Crown Social Hall, a

club owned by Whiting that operated as a community center

and, the government alleged, a center of drug distribution

and money laundering activities. At trial, the government

alleged that Wadlington's primary role was to provide

security for the organization. Wadlington was convicted of

one count of conspiracy to distribute cocaine, one

-35-

substantive distribution count, and one count of possession

of an unregistered firearm. His primary argument on appeal

is a challenge to his firearms conviction.

Wadlington was charged under 26 U.S.C. 5861(d), which

makes it unlawful for any person "to receive or possess a

firearm which is not registered to him in the National

Firearms Registration and Transfer Record." This offense

requires not only proof of possession and nonregistration,

but also proof that the weapon in question is a "firearm"

under the statute. The statutory definition of "firearm"

under 26 U.S.C. 5845 is somewhat narrower than that term's

commonly understood meaning, see United States v. De Bartolo,

482 F.2d 312 (1st Cir. 1973), and as Wadlington was accused

of possessing an unregistered shotgun, the statute required

proof that the shotgun in question had a barrel length of

less than 18 inches, or an overall length of less than 24

inches, and could fire (or could be restored to fire) shotgun

shells. 26 U.S.C. 5845(c), (d).

The trial court's charge to the jury on the firearms
count, however, omitted this element. The court instructed

the jury as follows:

Steven Wadlington . . . [is] indicted for conspiracy and
three counts of distribution. And Count 32, possession
of an unregistered firearm. That is this sawed off
shotgun, and it doesn't matter who you are or what
otherwise you are doing, it is a violation of the law to
possess such an item unless it has been duly registered
as described by the witness, and there is evidence that
this firearm [has] not been so registered. So the
government doesn't have to prove he is a felon, a user,

-36-

or anything else, he could be a college president or an
archbishop, but he must not possess that firearm.

At no time did the court define "firearm" or instruct the

jury that it was their responsibility to determine that the

shotgun in question was one having a barrel length of less

than 18 inches or an overall length of less than 24 inches

and either operable or capable of being made operable.11

On appeal, the government concedes--as it must--that it

was error to omit the applicable definition of "firearm," and

submit the issue to the jury. Wadlington failed to object to

the district judge's jury instruction at trial and

accordingly, we review only for "plain error." Fed. R. Crim.

P. 30, 52(b). The Supreme Court has recently glossed the

latter rule by stating that there must be an error, it must

be "clear" or "obvious," and it must affect "substantial

rights." United States v. Olano, 113 S. Ct. 1770, 1777-78

(1993). If these criteria are met, the court of appeal "has

authority to order correction, but is not required to do so,"

id. at 1778, and should exercise its remedial discretion only

"in those circumstances in which a miscarriage of justice

would otherwise result," or where the error "seriously

11We focus upon the length and operability, as the
parties do in the briefs, because there is repeated reference
in the testimony to the weapon as a "shotgun," the weapon was
actually shown to the jury, and there is virtually no dispute
that it was in fact a shotgun. For this reason, the district
court's reference to "this sawed off shotgun"--which might in
other circumstances look like a court determination of the
issue--is patently harmless.

-37-

affect[s] the fairness, integrity or public reputation of

judicial proceedings." Id. at 1779 (internal quotations

omitted).

Although it is easy to see how the district judge could

have overlooked a relatively minor and undisputed element in

this massive case, we have little difficulty in concluding

that the error in omitting a statutory element--the

definition of the weapon--of the offense was "clear" or

"obvious." Whether that error affected Wadlington's

"substantial rights" is a more difficult question. Under

Olano, "in most cases it [the error] must have been

prejudicial: It must have affected the outcome of the

District Court proceedings." Id. at 1778. Further, in a

plain error context, "the defendant rather than the

Government . . . bears the burden of persuasion with respect

to prejudice." Id.

If the test of prejudice that applies in this case is

whether the jury on this record would have come to the same

result under a proper instruction, we think that it is clear

that the jury would readily have convicted. Starting with

the issue of length, there was testimony that the shotgun had

originally been a long-barrelled weapon and that a member of

the organization had sawed off portions of both the barrel

and stock. Dawkins testified that when he bought the weapon

from the organization for $850, it was "sawed off." Finally,

-38-

a government firearms expert testified at trial that "based

upon measurement" of the exhibit, it was a weapon that cannot

be possessed without being registered.

As to capacity of the weapon to fire or to be made

operable, the evidence is a trifle thinner: the government

showed that the organization had troubled to cut down the

weapon, that the gun had then been possessed by two members

of the organization involved in security, and that it had

then been sold to Dawkins--a continuing customer of the

organization--for $850. Although we question the

government's suggestion that its firearms expert was

implicitly testifying as to operability, the other evidence

very strongly suggests that the shotgun was regarded as a

functioning weapon by those with reason to know, and defense

counsel never contested operability.

All this may not be enough. One might, or might not,

read recent Supreme Court decisions to mean that where an

incorrect instruction is given, it may not be adequate for

the government to show that the record evidence assured that

a reasonable jury under proper instructions would have found

the disputed element in favor of the government; rather, it

may be the law that the jury must in fact have made this

finding despite the erroneous instruction.12 Such a

12See, e.g., Sullivan v. Louisiana, 113 S. Ct. 2078,

2081-82 (1993); Yates v. Evatt, 111 S. Ct. 1884, 1893-94

(1991); Carella v. California, 491 U.S. 263, 269-71 (1989)

-39-

showing would be difficult to make in this case (since there

was no instruction on length or operability); but whether it

is necessary is unclear.

The question need not be answered here. Even if we

assume in this case that the error did "affect substantial

rights," we do not think that this error caused a

"miscarriage of justice" or "seriously affect[s] the

fairness, integrity or public reputation of judicial

proceedings." Olano, 113 S. Ct. at 1778-79. The undisputed

evidence showed that this was a sawed off shotgun treated by

all as a working weapon. There is thus no risk that the

omission of the length and operability elements resulted in

the conviction of an innocent man. Cf. Singleton v. United

States, No. 92-1647, 1994 WL 242519 (1st Cir. June 10, 1994).

Further, there is no indication that defense counsel

ever sought to litigate or dispute the length or operability

of the weapon. Although a not guilty plea puts the

government to its proof on all elements (and so it is error

not to instruct on all), in practice defendants often choose

to fight on their strongest grounds and let others go by

default. Finally, counsel's failure to argue the issues in

summation or to object to the patent omission in the charge

implies that the issues in question were not thought worth

(Scalia, J., concurring in the judgment). Compare Pope v.

Illinois, 481 U.S. 497, 503 (1987).

-40-

contesting; and to reverse on this ground would enhance the

opportunities for "sandbagging" the district judge. Taking

all of these considerations together, we decline under

Olano's fourth and discretionary prong to "notice" this

"forfeited error." Olano, 113 S. Ct. at 1778.

C. Kenneth Bartlett

Bartlett, who was alleged to have served as a security

worker and enforcer in the Whiting organization, was in the

second group of defendants that went to trial on November 19,

1991. On the sixth day of trial, Bartlett pled guilty to one

charge of conspiracy to distribute cocaine. Based on the

quantity of cocaine involved in the conspiracy, the district

court determined a guideline range for the offense of 262 to

327 months and, on recommendation of the government,

sentenced Bartlett to the guideline minimum of 262 months

with a caveat that this sentence run consecutively to two

state sentences for second degree murder which Bartlett was

already serving.

Bartlett's argument on appeal is that the guidelines

required that his federal sentence run concurrently with his

state sentences. Since he failed to object to the

consecutive sentence at the time, our review is limited to

plain error. We agree that under the Olano test already

discussed, Bartlett must be resentenced. Because we are

satisfied that the requisites for plain error review are

-41-

present, we do not reach Bartlett's contention--raised for

the first time on appeal--that his trial counsel's failure to

object to the consecutive sentence violated the Sixth

Amendment.13

In this case, after the district court determined the

guideline range for the conspiracy charge, it then considered

whether to make the federal sentence consecutive or

concurrent to the state sentences. The court found that

although Bartlett had been allowed to plead guilty to second

degree murder, the conduct underlying both convictions would

have supported convictions for first degree murder.

Concluding that under Massachusetts law Bartlett would be

eligible for parole in 16 years and would probably not be

held past that date, the court concluded the federal sentence

should run consecutively rather than concurrently.

The governing statute confers broad authority on the

district court to determine whether a sentence is consecutive

or concurrent. See 18 U.S.C. 3553(a), 3584(a), (b). That

discretion, however, is confined by guideline provisions that

govern this choice where sentence is imposed on a defendant

who is "subject to an undischarged term of imprisonment."

13Normally, the reasons for a counsel's action are
pertinent and a Sixth Amendment claim cannot usually be
determined in the first instance by an appellate court.
United States v. Sanchez, 917 F.2d 607, 613 (1st Cir. 1990),

cert. denied, 499 U.S. 977 (1991).

-42-

U.S.S.G. 5G1.3.14 See United States v. Flowers, 995 F.2d

315, 316-17 (1st Cir. 1993). The guideline applicable here

provides that--with two exceptions not now relevant15--"the

sentence for the instant offense shall be imposed to run

consecutively to the prior unexpired term of imprisonment to

the extent necessary to achieve a reasonable incremental

punishment for the instant offense." U.S.S.G. 5G1.3(c).

The commentary then provides that to the extent

practicable the court should determine the "reasonable

incremental punishment" by determining a sentence "that

results in a combined sentence that approximates the total

punishment that would have been imposed under 5G1.2

(Sentencing on Multiple Counts of Conviction) had all of the

offenses been federal offenses for which sentences were being

imposed at the same time." U.S.S.G. 5G1.3, comment. (n.4).

Section 5G1.2, so far as pertinent here, directs the court to

(1) determine the total punishment for multiple counts in

14Bartlett was sentenced on March 11, 1992, and we
accordingly apply the 1991 version of the guidelines.

15The first exception requires a consecutive sentence in
certain instances (e.g., where the second offense was

committed while the defendant was actually serving his first
sentence) and the second exception requires concurrent
sentences where the undischarged term of imprisonment
resulted from an offense or offenses "that have been fully
taken into account" in determining the offense level for the
instant offense. Id. 5G1.3(a), (b). Here, the district

court did not consider the murders in setting either the
offense level or the criminal history category for the drug
conspiracy offense.

-43-

accordance with the guideline grouping rules and (2) then

make the sentences for the multiple counts run consecutively

"only to the extent necessary to produce a combined sentence

equal to the total punishment" determined under the grouping

rules. U.S.S.G. 5G1.2(d). See generally United States v.

Hernandez-Coplin, No. 92-2228, slip. op. at 17-19 (1st Cir.

March 31, 1994).

Section 5G1.2(c) provides that the sentences on all

counts shall run concurrently if the sentence imposed on the

count carrying the highest statutory maximum is adequate to

achieve the total punishment. Bartlett urges that because

his state sentences were for life imprisonment, those

sentences were automatically sufficient to satisfy subsection

(c). We believe that this guideline refers to the real or

effective sentence--not to a nominal one. After all, one of

the primary goals of the federal guidelines is "honesty in

sentencing," whereby "the sentence the judge gives is the

sentence the offender will serve." Stephen Breyer, "The

Federal Sentencing Guidelines and the Key Compromises Upon

Which They Rest," 17 Hofstra L. Rev. 1, 4 (1988). Bartlett

does not here dispute the finding that the state sentence was

effectively one for 16 years.

Accordingly, had the district court followed the

tortuous path prescribed by the guidelines, it would have

determined the approximate "total punishment" as if Bartlett

-44-

was being sentenced on both state murder charges and the

federal drug conspiracy charge at the same time in federal

court. The grouping rules forbid treating murders as closely

related counts with each other or other crimes, U.S.S.G.

3D1.2, and the second-degree murders each carry a base

offense level of 33. U.S.S.G. 2A1.2(a). Although the

government points to the district court's finding that the

underlying conduct supported convictions for first-degree

murder, a sentencing court under the guidelines must

determine the applicable guideline "by looking to the charge

of which the offender was convicted." United States v.

Blanco, 888 F.2d 907, 910 (1st Cir. 1989).

Under the "combined offense level" formula, combining

these three offense levels--36 for the federal drug

conspiracy and 33 each for the two murders--produces a total

offense level of 39. U.S.S.G. 3D1.4(a).16 A base

offense level of 39, combined with Bartlett's criminal

history category of four, yields a guideline range of 360

months to life. See U.S.S.G. Ch. 5 Pt. A (Sentencing Table).

In exercising its discretion, the district court could have

chosen any figure within this range as the appropriate total

16This formula is intricate but mechanical. One starts
with the highest offense level (here 36) and increases it by
a number of levels based on a table of "units." Here, the
number of units was three--one for the drug conspiracy and
one each for the murders--and three units is equal under the
table to an increase of three levels. U.S.S.G. 3D1.4.

-45-

punishment for the drug conspiracy and two second-degree

murder convictions. Then, given its estimate that the murder

convictions represented 192 months (12 times 16 years), it

should have imposed a sentence for the drug conspiracy and

had it run consecutively "only to the extent necessary" to

make the resulting total period of incarceration equal to the

total punishment that would have been imposed had all three

crimes been sentenced at the same time. U.S.S.G. 5G1.2.

While one gulps at using the term "plain" error in the

face of this morass of rules, the district court's approach

stands the guideline process on its head. Here, instead of

calculating the proper total punishment for all three crimes

and then making the actual federal sentence consecutive to

the extent needed to produce a comparable outcome, the

district court computed a sentence for the drug offense alone

and then made a single yes-or-no choice between a wholly

concurrent and a wholly consecutive sentence. This is a

fundamental departure from the structure imposed by the

guidelines.

We also have no hesitation in concluding that the error

probably affected the sentence. Although the district court

might (as a matter of mathematics) have arrived in a total

punishment identical to that prescribed--namely, an effective

estimated sentence of 454 months (192 months for the state

offenses plus 262 months for the federal offense)--the odds

-46-

of this happening seem to us remote. Here the binary choice-

-either to make the sentence consecutive or concurrent--is

quite likely to have constrained the district court's choice,

and (as it proved) not to the defendant's advantage.

The Supreme Court has said that even if plain error is

shown to have affected the outcome, the reviewing court

retains constrained discretion whether or not to reverse.

See Olano, 113 S. Ct. at 1778-79. In this case, we think

that that discretion should be exercised in favor of a remand

for resentencing, fully recognizing that the defendant may

not in the end profit from this effort. Our reason is not

that this error "affects the fairness, integrity or public

reputation of judicial proceedings." Rather, in this case we

think it is very likely that the resentencing could produce a

different and more favorable sentence.17 If so, the

situation corresponds mutatis mutandis to one in which a

forfeited error may have caused the conviction of an innocent

person, the other rubric under which a plain and prejudicial

error should be noticed on appeal. Olano, 113 S. Ct. at

1779. We add that the burden in resentencing is light.

CONCLUSION

17If the district court had desired to give a longer
sentence, it could easily have chosen a federal term greater
than the guideline minimum. Thus, if the district court did
feel constrained by the binary choice, it was in the
direction of imposing a sentence greater than it would have
preferred.

-47-

The convictions and sentences of Darryl Whiting, Sean

Dixon, Renaldo Pledger, Edwin Carmichael, Steven Wadlington

and William Bowie are affirmed. The sentence of Kenneth

Bartlett is vacated and the matter is remanded for

resentencing.

-48-