**UNITED STATES of America, Appellee,**

v.

**Charles E. TAYLOR, Defendant, Appellant.**

**No. 88–1397.**

United States Court of Appeals, First Circuit.

Heard Sept. 9, 1988.

Decided Nov. 15, 1988.

Rehearing Denied Dec. 23, 1988.

Anthony M. Fredella with whom Fredella & Wheeler, Somerville, Mass., was on brief, for defendant, appellant.

Ralph C. Martin, II, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, ALDRICH and TORRUELLA, Circuit Judges.

COFFIN, Circuit Judge.

Appellant claims that federal drug and weapons charges against him must be dismissed because he was not tried within the time limitations provided by the Interstate

Agreement on Detainers Act ("the IAD" or "the Agreement"), 18 U.S.C. app. pp. 585–91. For the reasons discussed below, we conclude that the Agreement was not violated, and that the judgment of the district court therefore should be affirmed.

## I.

The IAD establishes a uniform set of procedures for temporarily transferring a prisoner incarcerated in one jurisdiction to the custody of another jurisdiction so that criminal charges pending in the receiving jurisdiction may be resolved. The Agreement, which is triggered by the filing of a detainer notifying the custodial state of the outstanding charges,[1] was enacted because of the adverse effects on the rehabilitation of prisoners against whom detainers had been lodged. Art. I; *United States v. Mauro*, 436 U.S. 340, 349–51, 98 S.Ct. 1834, 1841–43, 56 L.Ed.2d 329 (1978); *United States v. Currier*, 836 F.2d 11, 15 (1st Cir.1987). These consequences include denial of privileges within the prison—such as placement in training and more relaxed work environments—and reduced interest in rehabilitation because of apprehension over the outcome of the remaining charges. *Mauro*, 436 U.S. at 359–60, 98 S.Ct. at 1846–47.

In the belief that the adverse effects of detainers stem primarily from their lengthy duration, the IAD's drafters identified the Agreement's motivating purpose to be encouragement of the "expeditious and orderly disposition" of outstanding charges. Art. I. To that end, the Agreement sets strict time limits for trying prisoners transferred under the Agreement.

When a prisoner is transferred at the request of the receiving jurisdiction, as occurred in this case, the IAD requires that a trial begin within 120 days of the prisoner's arrival, or the charges must be dismissed with prejudice. Arts. IV(c), V(c). The court, however, may grant a reasonable

continuance "for good cause shown in open court, the prisoner or his counsel being present." Art. IV(c). The time period also may be tolled "whenever and for as long as the prisoner is unable to stand trial." Art. VI. Article IV(e) provides that once the receiving state obtains custody of the prisoner, it must try him before returning him to his "original place of imprisonment."

## II.

The United States Marshals Service filed a detainer against appellant on February 6, 1987 at the Middlesex County Jail, where he was awaiting trial on state drug trafficking charges. Five weeks later, on March 13, appellant was convicted in state court and sentenced to ten years in prison. On March 31, while still housed at the Middlesex Jail, appellant was transferred to federal custody and arraigned before a federal magistrate on the five-count indictment at issue in this case. He was returned to the Middlesex Jail, and thus to state custody, that same day.

Appellant remained at the Middlesex Jail until April 6, when he began a series of moves among three different state correctional institutions. These transfers were followed by another stint at the Middlesex Jail, where he was housed for about two weeks in July while on trial in state court on a murder charge. On July 30, he was returned to MCI–Cedar Junction, the state institution where he is serving his sentence.

On May 12, appellant had filed a series of pre-trial motions in his federal case. The magistrate ruled the next day on all but a motion to suppress evidence, leaving that motion for resolution by the district court. On May 28, the government filed a motion for a trial date, and the district court granted the motion and scheduled the trial for June 29. According to the government, defense counsel subsequently re-

---

1. A detainer is " 'a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.' " *United States v. Mauro*, 436 U.S. 340, 359, 98 S.Ct. 1834, 1846, 56 L.Ed.2d 329 (1978) (quoting H.R.Rep. No. 91–1018, p. 2 (1970); S.Rep. No. 91–1356, p. 2 (1970)) U.S.Code Cong. & Admin. News 1970, p. 4864. A detainer remains lodged against a prisoner indefinitely, until the charges underlying it are resolved.

quested a continuance to allow appellant to dispose of the murder indictment then pending against him in state court. Appellant, however, challenges whether the continuance was instigated by him, pointing out that there is no record evidence concerning the reason for postponing the trial. In any event, the trial was not held in June, and a pretrial conference took place on November 24, at which time the trial was reset to January 5, 1988.

On December 31, appellant filed a motion to dismiss the indictment based on violations of the IAD. The court held a hearing on that motion, as well as on the still outstanding motion to suppress evidence, on January 12. Both motions were denied, and appellant gave his provisional plea of guilty to four of the five counts of the federal indictment. He subsequently filed this appeal, claiming that the IAD required dismissal of the indictment against him.

### III.

■ We dispose first of the argument that the IAD was violated when appellant was returned to state custody immediately following his arraignment in federal court. A literal reading of Section IV(e) of the Agreement requiring a prisoner to be tried before he is returned to the original jurisdiction's custody would lead to the conclusion that a violation occurred here. We decline to so find, however.

We agree with the Second Circuit that "a one-day interruption of state prison confinement pose[s] no threat to a prisoner's rehabilitation sufficient to constitute a violation of the Agreement." *United States v. Roy*, 771 F.2d 54, 60 (2d Cir.1985); *United States v. Chico*, 558 F.2d 1047, 1049 (2d Cir.1977). *But see United States v. Thompson*, 562 F.2d 232, 233–35 (3d Cir. 1977) (en banc); *United States v. Schrum*,

504 F.Supp. 23, 26–28 (D.Kan.1980), *aff'd*, 638 F.2d 214 (10th Cir.1981). Indeed, requiring the federal government in this case to retain custody of appellant until his trial would conflict with the Agreement's goal that a prisoner be able to pursue his original rehabilitation program with as little interruption as possible. *See Roy*, 771 F.2d at 60. In addition, such a reading of the IAD might lead the government to delay arraignments, a disservice to defendants.

Undoubtedly, the requirement that a prisoner be tried before being returned to his original jurisdiction primarily was designed to avoid the shuttling of prisoners back and forth between institutions in different states or in distant parts of the same state.[2] It makes no sense to interpret the provision to prevent the federal government from returning a prisoner *on the same day* to a state institution located across town after a brief proceeding. So long as the charges against a prisoner are resolved within the time limits provided by the IAD, the purposes of the Agreement are fully satisfied by allowing the federal government to return a state prisoner to his original place of imprisonment after one brief detention for a federal arraignment or other proceeding.

We next consider whether more than 120 countable days elapsed before appellant's trial date of January 12, 1988.

### IV.

■ This case raises several questions about how to count days under the IAD, among them, determining the proper date to start counting. The government argues, for example, that the 120–day period was not triggered until July 30, 1987, after appellant's series of transfers among state correctional facilities ended and he was returned to MCI–Cedar Junction following

---

**2.** The distance between facilities is not, of course, the only evil against which this provision protects. The repeated shifting of a defendant between two nearby facilities also would burden the prisoner. In addition, the Supreme Court has noted that "the real concern of this provision was that, if the prisoner were returned to the sending State prior to the disposition of the charges in the receiving State, the detainer previously lodged against him would remain in effect with all its attendant problems." *Mauro*, 436 U.S. at 361 n. 26, 98 S.Ct. at 1847 n. 26. In short, this provision reflects, in various ways, the IAD's overall purpose that the charges underlying a detainer be resolved quickly and in a manner that limits the burdens imposed on prisoners by detainers.

sentencing on the murder charge. This position is based on *Crooker v. United States*, 814 F.2d 75, 77–78 (1st Cir.1987), in which we held that the IAD does not apply to defendants in custody until they have "entered into the life of the institution" to which they have been committed for a term of imprisonment. *See United States v. Roberts*, 548 F.2d 665, 670–71 (6th Cir. 1977); *United States v. Harris*, 566 F.2d 610, 612–13 (8th Cir.1977).

The government's theory is that appellant did not settle into life at MCI–Cedar Junction until his temporary assignments elsewhere ended. The government also argues that the 120–day time period did not begin to run until after appellant's first appearance in federal court after July 30, which was for the pretrial conference on November 24. Thus, the government contends that appellant's earlier appearance in federal court for arraignment was irrelevant under the IAD because the Agreement is not triggered by a transfer of custody that occurs before the prisoner is serving a term of imprisonment.

Appellant, meanwhile, argues that the IAD became applicable as soon as he was sentenced on March 13, claiming that that is when he met the Agreement's requirement that he have "entered upon a term of imprisonment in a penal or correctional institution," Art. III(a). This argument in essence asks us to reconsider our ruling in *Crooker*, in which we held that the time a defendant spends in custody *after* sentencing but *before* he has been taken to the correctional facility in which he will serve his sentence is not covered by the IAD's time limits. Alternatively, appellant urges us to designate April 6—the day he first

was sent from the Middlesex Jail to MCI–Cedar Junction—as the starting date.

In addition, appellant argues that if we decide that either April 6 or July 30 is when he entered into institutional life, the 120 days started running immediately on such date because all requirements for activating the IAD had been met. He claims that there is no requirement that the relevant period of imprisonment begin before the transfer of custody that triggers the 120 days. He therefore argues that because a transfer of custody occurred when he was arraigned on March 31, the 120–day clock began running as soon as he fulfilled the final IAD requirement—entering into the life of the institution.

▮ We need not resolve these issues concerning starting times because our discussion in Section V below disposes of the case no matter which of the proposed triggering dates we choose. We note, however, that April 6—the day appellant first was sent from the Middlesex Jail to MCI–Cedar Junction—appears to be the date on which appellant "entered into the life of the institution," starting the IAD clock. This was the facility to which he was assigned to serve his sentence, and his arrival there therefore should mark his entry into his term of imprisonment. It should not matter whether appellant was in fact able to begin a rehabilitation program upon arrival since the IAD sets out a bright line rule for triggering its clock. *Crooker*, 814 F.2d at 78. Once a prisoner has arrived at his ultimate destination, the IAD should apply, even if the receiving state then chooses to disrupt the rehabilitation program for its own purposes.[3]

---

3. We acknowledge that this conclusion arguably encourages the original jurisdiction to hold a prisoner in a temporary facility for extended periods. In this case, for example, the state arguably could have saved days by holding appellant at the Middlesex Jail until after his murder trial. We considered, and rejected, this argument in *Crooker*, 814 F.2d at 78. We suspect, however, that there is a point beyond which custody in a "temporary" facility would no longer be deemed temporary, and the prisoner would be considered to have "entered upon a

term of imprisonment," Art. III(a). It also should be noted, however, that there is no apparent reason why the sending jurisdiction would have an interest in saving time for the receiving jurisdiction.

We offer no opinion on the government's theory that the IAD clock did not start running until November, following appellant's first appearance in federal court *after* he had been sent to MCI–Cedar Junction, rather than immediately upon his arrival at the prison.

## V.

The government argues that all time between appellant's filing of his motion to suppress on May 12, 1987, and the court's resolution of the motion on January 12, 1988 is excludible from the 120–day time period. Appellant concedes that this issue disposes of the case if the government prevails.

Article VI of the IAD provides as follows:

(a) In determining the duration and expiration dates of the time periods provided in articles III and IV of this agreement, the running of said time periods shall be tolled whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter.

Courts have interpreted this language "to exclude all those periods of delay occasioned by the defendant," *United States v. Scheer*, 729 F.2d 164, 168 (2d Cir.1984); *United States v. Nesbitt*, 852 F.2d 1502, 1516 (7th Cir.1988); *United States v. Roy*, 771 F.2d 54, 59 (2d Cir.1985); *Bush v. Muncy*, 659 F.2d 402, 408–09 n. 4 (4th Cir.1981); *United States v. Black*, 609 F.2d 1330, 1334–35 (9th Cir.1979); *Foran v. Metz*, 463 F.Supp. 1088, 1097 (S.D.N.Y.1979), *aff'd without opinion*, 603 F.2d 212 (2d Cir. 1979). In essence, these courts have held that a defendant waives the 120–day limitation during the time it takes to resolve matters raised by him. *United States v. Hines*, 717 F.2d 1481, 1486–87 (4th Cir. 1983).

We agree in principle with this approach, and conclude that it is dispositive here, since appellant's motion was pending for seven months. Our only hesitation in reaching this decision arises from appellant's uncontested assertion that this particular suppression motion took virtually no time to decide because the decision was based solely on appellant's failure to file a required affidavit. According to appellant, the motion could have been decided at any time following its submission on May 12. Assuming this to be true, we considered whether it might be inappropriate to characterize the court's delay in rendering a decision as time in which "the prisoner is unable to stand trial."

After careful weighing, however, we conclude that it is appropriate to allocate the burden of this delay to appellant. Several factors contributed to this decision. First, the record indicates that appellant first informed the court that he was seeking to invoke the protections of the IAD when he filed his motion seeking dismissal of the indictment. It is therefore possible that the court was unaware of the IAD's applicability in this case until that time. *See Scheer*, 729 F.2d at 168 n. 1. Under the Speedy Trial Act, all time between the filing of a motion and the conclusion of a hearing on that motion is excluded from the 70–day limit, "whether or not a delay in holding that hearing is 'reasonably necessary,'" *Henderson v. United States*, 476 U.S. 321, 106 S.Ct. 1871, 1877, 90 L.Ed.2d 299 (1986). Thus, the district judge may have assumed that, consistent with the primary statute protecting speedy trial rights, he could turn to appellant's motion in the ordinary course of business, without needing to put it ahead of other items already on the court's calendar. In light of the Speedy Trial Act's more lenient approach, we doubt that the IAD was intended to impose a rigid rule of dismissal when a trial court uninformed about the applicability of the Agreement fails to act immediately on a motion that is expected to need a hearing.

Second, for us to hold that the district judge should have decided this motion sooner possibly would be to second-guess his decision to give appellant a generous period of time to obtain the necessary affidavit. We decline to assume that the judge neglected his duty to decide a motion in a timely fashion when he may have been trying to go out of his way to assist defendant.

Finally, we think it inappropriate for us to scrutinize each defense motion for the purpose of deciding whether a judge should have been able to dispose of it in two days, two weeks or two months. Many factors affect a judge's readiness to render a decision, and we would overstep our role were

we to intrude routinely into the trial judge's deliberative process. At least when the following circumstances coincide, we will presume that the period during which the court holds under submission a matter raised by the defendant is time during which "the prisoner is unable to stand trial": (a) the prisoner fails to alert the court to the IAD's applicability, (b) the time taken by the court for resolving the matter would be excluded under the Speedy Trial Act, and (c) the delay is neither in bad faith nor offensive to notions of justice.

 We emphasize that this would be a different case had appellant in his motion referred to the IAD and expressly sought a speedy disposition, or had he at any point before filing his motion to dismiss the indictment alerted the court to the applicability of the Agreement and his desire to be tried as nearly as possible within the 120–day period. If a defendant informs the court of his concerns about the IAD, there is substantially less reason to view the filing of defense motions as open-ended waivers of the 120–day trial deadline.[4] On the other hand, we see no reason to dismiss an indictment when a defendant has filed motions requiring a hearing without mentioning the applicability of the IAD.[5]

*Because we find no violation of the IAD, appellant's conviction is affirmed.*

---

**4.** We need not at this time decide how quickly a judge informed about the applicability of the IAD would have to decide a defense motion in order to avoid a violation of the Act's speedy trial requirements. In those circumstances, it may be justified to probe somewhat into the nature of the motion, and the need for a lengthy delay before disposition. It also should be emphasized that the Speedy Trial Act's liberal approach when a motion requires a hearing would not prevail over a stricter provision in the IAD. *See Mauro,* 436 U.S. at 356–57 n. 24, 98 S.Ct. at 1845–46 n. 24 ("In situations in which two different sets of time limitations are prescribed, the more stringent limitation may simply be applied.")

**5.** We note, in addition, that a trial date originally had been set for June 29. Although there is a dispute over whether the trial was postponed at appellant's request, we suspect that appellant—appropriately—would have made much of a delay attributable to the government or the court. We find no indication in the record, however, that appellant ever contested in the district court the government's representation that the continuance was granted at his request. Nor does appellant contradict the government's assertion on appeal; he merely notes that the record fails to show the basis for the continuance. Although our decision is not based on this, we think it worth recognizing that the suppression motion undoubtedly would have been decided in June had the trial not been rescheduled.