**UNITED STATES of America**

v.

**Vernon POPE**

**No. CR. WMN–00–470.**

United States District Court, D. Maryland.

Nov. 9, 2001.

---

**2.** The Ex Post Facto Clause also is made applicable to the Virgin Islands by § 3 of the Revised Organic Act, 48 U.S.C. § 1561.

Lynn A. Battaglia, Annapolis, MD, James H. Green, Office of the U.S. Attorney, Baltimore, MD, for Plaintiff.

Gary W. Christopher, Federal Public Defender, Baltimore, MD, for Defendant.

1. This indictment superceded an indictment returned by the Grand Jury on September 28,

*MEMORANDUM*

NICKERSON, District Judge.

Before the Court is Defendant's Motion to Dismiss with Prejudice, pursuant to the Interstate Agreement on Detainers, 18 U.S.C.App. 2 (Paper No. 14). Upon a review of the pleadings and the applicable law, the Court determines that no hearing is necessary and Defendant's motion will be granted.

## I. BACKGROUND

On October 5, 2000, Defendant Vernon Pope was indicted by the Grand Jury for the District of Maryland.[1] Under this indictment, Defendant was charged with possession of two firearms in violation of 18 U.S.C. § 922(g) and possession with intent to distribute a quantity of a mixture or substance containing a detectable amount of marijuana in violation of 21 U.S.C. § 841(a). At the time of the indictment's return, Defendant was serving a state sentence at the Maryland Correctional Institute in Hagerstown, Maryland ("MCI–Hagerstown").

Pursuant to the Interstate Agreement on Detainers, 18 U.S.C.App. 2, sec. 3 ("IAD"), a detainer was lodged with the Maryland Department of Corrections ("DOC") in late September, 2000. Subsequently, federal authorities made a written request for the temporary custody of Defendant for the purpose of prosecuting the federal charges.

On October 26, 2000, Defendant made his initial appearance in this Court before Magistrate Judge James Bredar. During the course of this appearance, Defendant asserted his right under Art. IV(e) of the

2000.

IAD to remain in federal custody until trial on the indictment was concluded. Defendant's assertion of his right was noted by the Court in its Order to temporarily detain Defendant. Defendant also informed the Court that he requires daily medication for his mental illness.[2] Defendant was transported to the Maryland Reception Diagnostic and Classification Center ("MRDCC") to be classified and held as a federal detainee.[3] Notwithstanding Defendant's assertion and the Court's Order, Defendant was returned to state custody by personnel at MRDCC. Due to this error, Defendant's detention hearing, set for October 30, 2000, had to be rescheduled.

On November 2, 2000, Defendant appeared in this Court before Magistrate Judge Paul Grimm for his detention hearing. At this hearing, Defendant reasserted, and the Court acknowledged, his right under Art. IV(e) of the IAD to remain in federal custody pending the resolution of the federal charges. Upon the conclusion of the hearing Defendant was again transported to the MRDCC to be classified and held as a federal detainee. Defendant was then, for a second time, erroneously returned to MCI–Hagerstown under state custody later that day. Defendant remained in state custody until his scheduled release date of November 14, 2000, at which time he "rolled over" into federal custody.

On November 15, 2000, Defendant moved to dismiss, with prejudice, the October 5, 2000, indictment on the ground that the anti-shuttling provisions of Art. IV(e) of the IAD were violated. An evidentiary

hearing was held on March 5, 2001, and the Court denied Defendant's motion to dismiss on March 27, 2001. In so doing, the Court found that any violation of the IAD was technical, and that the weight of authority among the Circuits at that time indicated that such technical violations did not warrant dismissal. *See,* Memorandum dated March 27, 2001.

In April, 2001, Defendant requested reconsideration of the motion to dismiss. The Court held an evidentiary hearing on May 11, 2001, to determine whether Defendant had been denied his medication at MCI–Hagerstown during the time between his appearance in this Court on November 2, 2000, and his eventual transfer into federal custody on November 14, 2000. The Court again denied Defendant's motion, finding that although "[c]redible evidence was presented by both sides on the issue of whether Mr. Pope was, or was not, provided with medication for his mental illness after he was inadvertently returned to State custody," the evidence remained in a state of equipoise, and any distress or injury resulting from a deprivation, if there was one, was *de minimis. See,* Letter Opinion dated May 15, 2001.

On May 24, 2001, Defendant pled guilty to Count One of the Superseding Indictment (possession of a firearm and ammunition by a convicted felon, pursuant to 18 U.S.C. § 922(g)(1)). The Court imposed a sentence of 70 months, departing from the Guideline Range of 77–96 months pursuant to U.S.S.G. § 5K2.0 for issues relating to Defendant's pretrial detention.

On May 30, 2001, Defendant filed an appeal.[4] On September 19, 2001, the Unit-

---

2. Defendant suffers from paranoid schizophrenia.

3. The United States does not have a federal detention center in Maryland. Instead, the United States Marshal has contracted with the State of Maryland whereby the State

agrees to process federal detainees and house them in Maryland institutions.

4. Defendant's plea agreement reserved to him the right to appeal from the denial of the motion to dismiss.

ed States Court of Appeals for the Fourth Circuit reversed Defendant's conviction, based on the United States Supreme Court's June 11, 2001, decision in *Alabama v. Bozeman,* 533 U.S. 146, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001). The Fourth Circuit remanded the case to this Court to decide whether the indictment should be dismissed with or without prejudice, pursuant to the IAD.

## II. DISCUSSION

■ There are two primary purposes behind the enactment of the IAD: the removal of uncertainties surrounding outstanding out-of-state charges against a prisoner, and the prevention of interruptions to prisoners' programs of treatment and rehabilitation. *See* 18 U.S.C.App. 2, § 2, Art. I. *See also U.S. v. Mauro,* 436 U.S. 340, 351, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978). The IAD seeks to achieve these goals via the speedy trial provisions of Art. III and the anti-shuttling provisions of Art. IV.[5]

Under Art. IV, a prosecutor in a receiving state,[6] who has lodged a detainer against a prisoner in another state,[7] can secure the presence, in the receiving state, of that prisoner for disposition of any outstanding charges. Once the receiving state obtains custody of the prisoner, Art. IV(e) requires the resolution of all outstanding charges before the prisoner is returned to the sending state, or the charges must be dismissed with prejudice. 18 U.S.C.App. 2, § 2 Art. IV(e).[8]

The IAD was amended in 1988 to implement special provisions when the United States is a receiving state, as is the case here. In such a situation, dismissal, if required, may be with or without prejudice. This determination is to be made upon consideration of several factors, including: the seriousness of the offense; the facts and circumstances leading to the dismissal; and the impact of re-prosecution on the administration of justice and the administration of the IAD. 18 U.S.C.App. 2, § 9(1).

■ In *Alabama v. Bozeman,* the U.S. Supreme Court held that the anti-shuttling directive of Article IV is absolute, and that no exceptions shall be made for "technical" or *de minimis* violations of the provision. 121 S.Ct. at 2084–85. In so holding, the Court rejected the line of authority upon which this Court had relied in originally denying Defendant's motion to dismiss. Now that Defendant's indictment must be dismissed under *Bozeman,* this Court must decide whether, after considering the factors set forth in section 9 of the IAD, the dismissal will be with or without prejudice to further prosecution. The factors will be discussed, *seriatim.*

### A. *Seriousness of the Offense*

Section 9 does not specify criteria for analyzing the seriousness of an offense. Courts tend to examine the nature of the conduct charged and the potential sentence of the charges. *See, e.g., United States v. Allen,* 80 F.Supp.2d 472, 474–75 (E.D.Pa.2000); *United States v. Kurt,* 945

---

**5.** Only the provisions of Art. IV are at issue here.

**6.** Under the IAD, the United States falls within the definition of a "state." 18 U.S.C.App. 2, § 2, Art. II(a).

**7.** Also referred to as the sending state.

**8.** Article VI(e) provides that "[i]f trial is not had on any indictment ... prior to the prisoner's being returned to the original place of imprisonment ... such indictment ... shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."

F.2d 248, 253 (9th Cir.1991); *United States v. Iwuamadi,* 716 F.Supp. 420, 425 (D.Neb.1989). In the present case, Defendant was charged with possession of two firearms in violation of 18 U.S.C. § 922(g) and possession with intent to distribute a quantity of a mixture or substance containing a detectable amount of marijuana in violation of 21 U.S.C. § 841(a). Defendant pled guilty to the former charge, which carries a maximum statutory sentence of ten years incarceration and a $250,000 fine. Defendant was found to have a criminal history category of VI, and was sentenced to 70 months incarceration.

The illegal possession of firearms and controlled substances are certainly serious offenses. Defendant's situation lacks, however, several characteristics that other courts have found persuasive in concluding that a dismissal without prejudice was warranted. *Compare, Allen,* 80 F.Supp.2d at 475 (charges of conspiracy involved "considerable planning" over a duration of more than a year, and carried maximum penalties of 19 years in prison and over $1.6 million in fines); *Iwuamadi,* 716 F.Supp. at 425 (charges involved a "complex scheme" to defraud financial institutions with "potential to do substantial harm"); *Kurt,* 945 F.2d at 252–53 (charges carried a possible penalty of 20 years imprisonment and indicated Defendant had "the materials and ability to produce counterfeit bills, to protect his illicit business with unregistered firearms, and to avoid prosecution"). Accordingly, the Court is not persuaded for or against dismissal with prejudice based on the circumstances of Defendant's charged conduct.

B. *Facts and Circumstances Leading to the Dismissal*

In conducting this analysis, courts generally look to the specific cause of the IAD violation and consider whether the government exhibited an improper motive to disregard the defendant's rights under the IAD. *Allen* at 475 (*citing Kurt* at 253; *Iwuamadi* at 426). The case at bar presents an unusual situation in this regard. Defendant does not contend that the prosecution wilfully violated his rights under the IAD. Rather, both parties are in agreement that Defendant's IAD rights were violated as a result of the procedures that were used by the United States Marshal Service, in conjunction with DOC officials, for tracking, transporting, and housing detainees under federal custody.

Maryland has no federal pretrial detention facility. The United States Marshal has contracted with the Maryland DOC for prison space to accommodate as many as 96 federally detained inmates at the Maryland Correctional Adjustment Facility (referred to as "Supermax"). According to testimony presented at the March 5, 2001, hearing on Defendant's motion to dismiss, the parties to the contract apparently were not made aware of their obligation to honor federal detainees' rights under the IAD. Transcript of March 5, 2001 hearing at 46–48.

At that hearing, Deputy United States Marshal Kenneth Plumley testified that the violations of IAD experienced by Defendant were not isolated instances. He explained that a state prisoner who is brought into federal court and then detained federally is taken-along with detainees intending to return to state custody-to the MRDCC for processing. Deputy Plumley testified that no written documentation of the prisoner's assertion of his right to remain in federal custody accompanies the inmate to MRDCC. As a result, officials at MRDCC typically receive unclear, misleading, or ambiguous information about whether to transport detainees from state prison to Supermax or back to state facilities. *Id.* at 41–49. Given this

situation, it is not hard to understand how Defendant ended up being erroneously sent back to state prison not once, but twice, despite his repeated assertions of his right to remain in federal custody.

The United States now asserts that this procedure has changed as a result of the present litigation, and consequently, a dismissal with prejudice is not necessary.[9] Government's Opp. at 7, n. 2. Apparently, prisoners who are subject to the IAD provisions are now transported directly to Supermax under federal custody, thereby bypassing MRDCC and hopefully eliminating the confusion generated by the previous procedure.[10] *Id.* If this new system works as planned, it is a welcome and overdue change. Defendant, however, did not benefit from this development. To dismiss his case without prejudice-which, under *Bozeman*, is the minimum amount of relief this Court must grant-would demonstrate little or no support for the recent policy changes. Instead, the Court urges that the new procedures be faithfully upheld, and hopes that this dismissal with prejudice will reinforce the commitment of all government actors-including the U.S. Marshal Service-to maintaining a system that honors the rights and obligations conferred by the IAD.

## C. *Impact of Reprosecution on the Administration of Justice and the Administration of the IAD*

Analysis of this factor involves an assessment of whether the IAD violation prejudiced the defendant. *See, Allen* at 476; *Kurt* at 254; *Iwuamadi* at 427. Defendant argues that he was prejudiced by being deprived of his psychotropic medication when he was erroneously returned to state custody between November 2 and November 14, 2000.[11] As noted in this Court's Memorandum and Order dated May 15, 2001, both parties have presented credible evidence on this issue. For example, Defendant's inmate medication chart for the month of November, and only the month of November, has apparently gone missing. Transcript of May 11, 2001, hearing at 58, 73. Yet, medical staff who observed Defendant on November 14, 2000, saw no indication that he was behaving as a paranoid schizophrenic who had been deprived of medication for twelve days. *Id.* at 126, 129–31. Because there remains a factual dispute as to whether Defendant was deprived of medication as a result of the IAD violations, the Court finds that this factor counsels neither for nor against dismissal without prejudice.

9. The government also asserts that no dismissal with prejudice is necessary because the prosecution did not wilfully violate the IAD in this case. The Court doubts, however, that an isolated wilful violation would necessarily cause more harm to prisoners or the administration of the IAD than what *did* occur; namely, an ongoing tolerance, by United States government officials, of a system that repeatedly failed to honor rights and obligations conferred by the IAD.

10. The Court notes that the Government has not supported their assertion with any evidence of this change or its actual effect on IAD violations.

11. Defendant also claims prejudice arising from his inability to meet with counsel during his wrongful incarceration at MCI–Hagerstown (approximately 70 miles from his attorney's office in Baltimore) between October 26, 2000, and November 14, 2000. The government counters with evidence that once properly in federal custody, Defendant was held at a federal facility about the same distance away from his attorney. The record indicates, however, that between November 14, 2000, and January 11, 2001, Defendant was held at Supermax in Baltimore City. Transcript of March 5, 2001, hearing at 34. If Defendant had been properly held in federal custody from October 26 to November 14, 2000, presumably at Supermax for at least some of that time, he arguably would have been able, more readily, to meet with counsel.

The Court does find, however, that a dismissal without prejudice in this case would be an affront the administration of the IAD, particularly in light of the *Bozeman* decision. In that case, the United States Supreme Court emphasized that the IAD's purpose is not limited to facilitating inmates' participation in rehabilitative programs; rather, the statute is also designed to protect inmates against the uncertainties generated by interstate detainers. 121 S.Ct. at 2085–86. Allowing re-prosecution of Defendant would send a message to state prisoners who are transported to federal court for prosecution that by invoking their IAD rights they risk even *greater* uncertainty down the road (i.e., possible re-indictment) if their rights are violated. Such a result would trivialize the violation and fly in the face of the Supreme Court's explication of the purpose behind the IAD.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss With Prejudice will be granted.