**UNITED STATES Of America**

v.

**Kevin M. KELLEY and Patrick O'Shea**

**No. 02–10286–MLWC.**

United States District Court,
D. Massachusetts.

March 7, 2003.

Donald L. Cabell, United States Attorney's Office, Boston, MA, for Plaintiffs.

Syrie D. Fried, Federal Defender's Office, David S. Schumacher, Roberto M. Braceras, Goodwin Procter, LLP, Boston, MA, for Defendant.

## MEMORANDUM AND ORDER

WOLF, District Judge.

## I. INTRODUCTION

Defendant Kevin M. Kelley is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The events leading up to this charge involved an alleged armed robbery by Kelley on January 22, 2002. The parties agree, for the purposes of this motion, that Kelley will be subject to the sentence enhancement and mandatory minimum of 18 U.S.C. § 924(e) because he is an "armed career criminal." Thus, if convicted, he will be sentenced to at least 15 years in federal prison. *See* 18 U.S.C. § 924(e).

On December 5, 2002, Kelley filed a motion to dismiss the indictment against him for an alleged violation of the Interstate Agreement on Detainers, 18 U.S.C.App. § 2 ("IAD"). On December 20, 2002, the government submitted an opposition. On February 3, 2003, after completing several days of hearings on the various motions to suppress, the court held an evidentiary hearing concerning Kelley's motion to dismiss. On February 6, 2003, the parties supplemented their earlier submissions. For the reasons described below, the court is allowing Kelley's motion to dismiss and dismissing the indictment without prejudice.

## II. FINDINGS OF FACT

The following facts have been proven by a preponderance of the evidence.

On the afternoon of January 22, 2002, Kelley was arrested by officers of the Bos-

ton Police Department. The officers had probable cause to believe that Kelley had committed several crimes that afternoon, including armed robbery.

Between January 22, 2002 and March 8, 2002, Kelley was in pretrial detention in the Suffolk County Jail on state charges.

On February 20, 2002, Special Agent Michelle Lalanne of the United States Bureau of Alcohol, Tobacco and Firearms filed a criminal complaint against Kelley. On the same day, Magistrate Judge Robert Collings issued a warrant for Kelley's arrest. On February 21, 2002, a federal detainer was lodged with the Suffolk County Sheriff's Department.

On March 8, 2002, Kelley began serving a state sentence at the Norfolk County Jail ("Norfolk"). The federal detainer "followed" Kelly to Norfolk.

On August 29, 2002 Kelley, still serving his state sentence, filed a request for speedy trial under the IAD with the Clerk of this District Court. On September 11, 2002, the Magistrate Judge issued a Writ of Habeas Corpus to the "Warden of the Norfolk County Correctional Center" ordering him to bring Kelley to federal court for his initial appearance in this case.

On the morning of September 17, 2002, Kelley was assigned to bed B of room 15 of unit H2A at Norfolk. Later that day, he was brought to federal court and had his initial appearance before the Magistrate Judge. Kelley refused to waive his rights under the IAD. Recognizing that Kelley had to be kept in federal custody until this case was resolved, the Magistrate Judge ordered that the Marshal retain custody of Kelley pending further order of the court.

There is no federal pretrial detention facility in the District of Massachusetts. Consequently, the United States Marshals Service ("USMS") has entered into agreements with certain state facilities to provide for the housing and care of federal detainees. The USMS entered into an agreement with the Norfolk County Jail on March 1, 2002. Supervisory Deputy United States Marshal Walter Doherty decided that since Kelley had come from Norfolk and probably had personal effects at that facility, it would be best to send Kelley back to Norfolk as a federal detainee. Norfolk would bill the USMS for Kelley's care under the agreement and Kelley would not have to endure being transferred to a different facility. Doherty contacted Norfolk to explain that Kelley did not waive his rights under the IAD and that Norfolk was to start billing the USMS for Kelley's housing as of September 17, 2002.

Since Norfolk began housing federal pretrial detainees, Kelley was the first person to be sent back to Norfolk with a court-ordered change in status from state prisoner to federal pretrial detainee. In addition to Doherty's call, Norfolk was notified of Kelley's new status by means of a form that accompanied Kelley on his return to Norfolk on September 17, 2002. A Deputy United States Marshal signed a form entitled "Prisoner Remand or Order to Deliver and Receipt for United States Prisoners" that indicated that Kelley was to be held by Norfolk as a federal detainee. A Norfolk employee signed the form.

However, an administrative error occurred at Norfolk and Kelley was not treated as a federal pretrial detainee. Upon his return to Norfolk on September 17, 2002, Kelley went back to the same bed in the same room of the same unit. This unit, H2A, is not used to house pretrial detainees. It is used to house sentenced prisoners. There are only three units at Norfolk used to house pretrial detainees, P–MED, P–MAX and H1A. H1A is a "mixed" unit, housing both prisoners and detainees on separate tiers.

It is generally the policy of Norfolk to keep sentenced prisoners separate from pretrial detainees. However, Norfolk's agreement with the USMS does not require that federal pretrial detainees be kept in particular part of the facility or prohibit commingling federal pretrial detainees with state prisoners.

On September 27, 2002, Kelley appeared in federal court and pleaded not guilty to the charge in this case. A writ of habeas corpus for Kelley was not issued to secure his appearance in federal court on September 27, 2002 or for any subsequent appearance. Rather, the USMS has been able to produce Kelley by means of a "call-up list". A call-up list is a list of federal prisoners that the USMS wants brought from a state facility to the courthouse on a particular day. If a person is being held as a federal detainee, a state facility will produce that person whenever the USMS requests. If a person is a state prisoner, however, a federal judicial officer must issue a writ of habeas corpus to cause that person to be brought to federal court. For example, Kelley's co-defendant, Patrick O'Shea, who is a state prisoner, has been brought to court by means of such a writ.

On October 4, 2002, Kelley was removed from Norfolk by the Norfolk County Sheriff's Department and brought to the Norfolk County Superior Court, where he pleaded guilty to several state charges unrelated to this case. Kelley was sentenced to serve five to seven years in prison on those state charges. A sentence of this length is served in a Massachusetts Department of Corrections ("the MDOC") facility rather than in a county jail such as Norfolk. However, according to Kelley's attorney, imposition of that sentence was stayed for three weeks. After his October 4, 2002 court appearance, Kelley was returned to Norfolk.

On October 5, 2002, Kelley incurred a disciplinary violation and was moved from unit H2A to Norfolk's disciplinary isolation unit. On October 8, 2002, the Norfolk authorities brought Kelley back to the Norfolk County Superior Court, where, according to his attorney, the stay of his sentence was lifted. From court, Kelley was brought directly to MCI–Concord. At MCI–Concord, Kelley began serving his five to seven year state sentence. He is now earning credit on that sentence.

The federal detainer in this case "followed" Kelley to MCI–Concord. The MCI–Concord authorities have considered the detainer as an unresolved legal issue in deciding where Kelley should serve the bulk of his sentence.

Kelley has been assigned to MCI–Cedar Junction to serve the balance of his state sentence. It is not clear whether the detainer was a deciding factor in the MDOC's decision to assign Kelley to MCI–Cedar Junction rather than MCI–Norfolk.

No state authority notified the USMS, the United States Attorney's Office or this court on either occasion that the Norfolk County Sheriff's Department took Kelley to state court. According to Doherty, when a state court seeks the presence of a federal detainee standard procedure requires that the state seek permission from the Assistant United States Attorney prosecuting the case against the prisoner, the federal judicial officer to whom the case is assigned, and the USMS. Typically, such requests are denied, but in some cases the requests are granted.

The state authorities also did not notify the USMS that Kelley had been moved to MCI–Concord. In fact, the USMS did not become aware that Kelley had been moved from Norfolk until some point in November, 2002, when they sought to bring him into federal court for the pretrial conference in this case that was held on November 26, 2002. When the USMS contacted Norfolk to secure Kelley's appearance, it

was informed that Kelley was no longer at Norfolk. Doherty called Norfolk to locate Kelley and to investigate why he was moved. Doherty then learned that Kelley had been taken from Norfolk to MCI–Concord on October 8, 2002.

Although Norfolk did not move Kelley to a unit for pretrial detainees or otherwise treat Kelley as a federal prisoner except by permitting his September 27, 2002 court appearance without a writ, Norfolk did bill the USMS for Kelley's care. On October 2, 2002, Dean Coletti, the Assistant Director of Finance for the Norfolk County Sheriff's Office, sent a letter to William Ryan, the Massachusetts Marshal's Administrative Officer. The letter requested payment of $30,870 for the housing of nineteen federal prisoners during the month of September, 2002. This figure included thirty days of housing for Kelley. The bill should have reflected only fourteen days of housing for Kelley because before September 17, 2002 he was not a federal detainee. However, someone in the Marshal's Office informed Norfolk that no bill whatsoever should have been submitted for Kelley. The charge for Kelley was removed from the bill and a modified bill for $28,770 was submitted. On November 6, 2002, the USMS paid Norfolk $28,840.[1]

By the end of November, 2002, both state and federal authorities were aware that a mistake had been made concerning Kelley's custody. Doherty was present at the conference this court held on November 26, 2002 and stated that he had raised the issue of Kelley's custody with state authorities. Assistant United States Attorney Donald Cabell stated that he had received, but not yet listened to, a voice mail from someone at the MDOC regarding Kelley.

On December 13, 2002, Coletti sent a letter to Ryan billing the USMS for fourteen days of housing for Kelley in September, 2002. The same day, Coletti sent a second letter billing the USMS for seven days of housing for Kelley in October, 2002. The USMS paid the bills on January 14, 2003.

The USMS has an agreement with MCI–Concord for the housing of detainees that is similar to its contract with Norfolk. However, MCI–Concord has not been billing the USMS for Kelley's care. Nor is there any evidence that MCI–Concord intends to bill for Kelley in the future. Thus, MCI–Concord is currently treating Kelley as it would any other state prisoner serving a sentence with one exception. MCI–Concord is allowing the USMS to obtain Kelley's presence for court appearances without the use of a writ. He is brought to court by means of a call-up list.

The court finds that Kelley was not returned to state custody on September 17, 2002 after his appearance in federal court. Although Kelley was not housed with other pretrial detainees, Norfolk authorities were not required to house him in any particular part of their facility. The sovereign paying for a prisoner's care is an important factor in determining who has custody of him. *See United States v. Small,* 209 F.Supp.2d 1114, 1121–22 (D.Colo.2002) (citing Article V(h) of the IAD, which provides that the receiving state shall pay the costs of a prisoner's care until he is returned to the sending state and holding that "[i]f the [federal government as the] receiving state . . .

---

1. The parties did not explain why the USMS paid Norfolk an additional $70. This is the amount charged for housing one inmate for one day. There are some hand-written notations on one of the exhibits that indicate that Norfolk may have made a one-day error in billing for the housing of a prisoner named Joel Lopez that was subsequently corrected. In any event, the discrepancy is not material to the merits of the instant motion.

paid all costs of caring for and keeping Defendant after he was returned to the ... County Jail on July 10, 2001, it follows that Defendant was in federal custody, not state custody") (internal quotation marks omitted). In this case, Norfolk billed the USMS for Kelley. Although there was some initial confusion which prevented prompt payment of the bill, the USMS ultimately paid for the cost of Kelley's housing while he was at Norfolk. Thus, in view of the totality of the facts, the court finds that Kelley was not returned to state custody on September 17, 2002. *See United States v. Hunnewell*, 891 F.2d 955, 958 (1st Cir.1989) (affirming the district court's finding that defendant was not returned to state custody in light of the common practice in Maine of housing federal prisoners in state facilities, an order remanding the defendant to federal custody, a letter confirming to the warden confirming the defendant's status as a federal prisoner, and the fact that the USMS paid for the defendant's board).

However, the court finds that Kelley was returned to state custody on October 4, 2002 and October 8, 2002, when he was brought to Norfolk County Superior Court in connection with state charges against him. *Id.* at 957.

Moreover, even if Kelley was not returned to state custody when he was brought into state court, he has been in state custody since he was brought to MCI–Concord. The MDOC has been crediting Kelley with time served on his five to seven year sentence since his arrival at MCI–Concord. It is classifying him for transfer to another facility like any other state prisoner. As described earlier, although MCI–Concord has an agreement with the USMS for the housing and care of pretrial detainees, MCI–Concord has not billed the USMS for Kelley's care and there is no plan to do so in the future. The only difference between Kelley and

any of the other prisoners at MCI–Concord is that the USMS is able to secure his presence in federal court by way of a call-up list rather than being required to obtain a writ. This appears to be a courtesy that MCI–Concord has extended the federal government to reduce the risk of a dismissal of this case rather than a recognition that Kelley is a federal pretrial detainee. In view of the totality of circumstances, Kelley is in state custody.

## III. ANALYSIS

### A. *The United States Violated the Interstate Agreement on Detainers*

Forty-eight States, the Federal Government, and the District of Columbia (all of which, for simplicity, we shall call "States") have entered into the Interstate Agreement on Detainers (Agreement), 18 U.S.C.App. § 2, p. 692, an interstate compact. The Agreement creates uniform procedures for lodging and executing a detainer, i.e., a legal order that requires a State in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he may be tried by a different State for a different crime.

The Agreement provides for expeditious delivery of the prisoner to the receiving State for trial prior to the termination of his sentence in the sending State. And it seeks to minimize the consequent interruption of the prisoner's ongoing prison term. In particular, Article IV(c) specifies that the receiving State shall begin the prisoner's "trial ... within one hundred and twenty days of the arrival of the prisoner in the receiving State." At the same time, Article IV(e) prohibits return of the individual to the sending State before that trial is complete. It says:

"If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint *shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."* (Emphasis added.) [2] *Alabama v. Bozeman,* 533 U.S. 146, 148–49, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001). Article III(d) contains a similar anti-shuttling provision. When, as here, a defendant rather than the government has invoked the procedures of the IAD, Article III governs rather than Article IV. *See* IAD Art. III(a). The only difference between the anti-shuttling provisions of Article IV(e) and Article III(d) is that the language "prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof" in Article IV(e) is replaced with "return of the prisoner to the original place of imprisonment" in Article III(d). Article V(e) provides that "[a]t the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be returned to the sending State."

■ "So long as custodial responsibility actually shifts and applicable temporal limits are observed, retention of the prisoner in the same institutional setting cannot signify that he was 'returned to [his] original place of imprisonment' within the meaning of Article IV(e) of the IAD." *Hunnewell,* 891 F.2d at 959. Therefore, the fact that Kelley was returned to Norfolk would not have established an IAD violation if he remained in federal custody. Rather, the inquiry must focus on whether Kelley was returned to state custody.

The government advocates a literal reading of the language "original place of imprisonment" in Article III(d). Accord-

ing to the government, an IAD violation could only have resulted from Kelley returning to Norfolk rather than returning to state custody and being taken to another institution. In support of this proposition, the government cites *Merchant v. State of Wyoming,* 4 P.3d 184, 188–89 (Wyo.2000). After quoting the relevant passages of the IAD, the Wyoming Supreme Court wrote:

The State correctly points out that the meaning of the "original place of imprisonment" in Article III is different from that found in Article IV.

Merchant never was returned to his "original place of imprisonment," the correctional facility at Canon City, Colorado. He was returned to Weld County, Colorado, to facilitate the resolution of charges in Weld County while waiting for the Wyoming courts to schedule his trial on the Wyoming charges. Absent modifying language in Article III, similar to that in Article IV, Article III's definition of "original place of imprisonment" is more precise and restrictive than that of Article IV. Article III requires that the prisoner be returned to his "original place of imprisonment," the Colorado Territorial Correction Facility in Canon City, Colorado, while under Article IV, it appears to suffice if the prisoner is returned to the sending state.

*Id.*

This court respectfully disagrees with the Wyoming Supreme Court. Article IX of the IAD, which was not mentioned in *Merchant,* states that the IAD "shall be liberally construed so as to effectuate its purposes." The Supreme Court has described the purposes of the IAD as follows:

---

**2.** As explained in § III.B, *infra,* when the receiving state is the United States, the dis-

missal may be with or without prejudice. *See* 18 U.S.C.App. § 9.

The Agreement contains nine articles. Article I sets forth the problems that led to the Agreement's creation, namely, that "charges outstanding against a prisoner, detainers based on untried indictments, informations, or complaints and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation."

Article I then adds that "it is the ... purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of ... detainers...."
*Bozeman,* 533 U.S. at 149–50, 121 S.Ct. 2079; *accord United States v. Mauro,* 436 U.S. 340, 359–61 nn. 25–26, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978) (discussing why prompt resolution of detainers is important to rehabilitation and other conditions of confinement).

The purposes of the IAD would not be served by allowing a prisoner to be returned to the sending state, but depriving him of any remedy if the sending state housed him in a facility other than the one in which he was serving his original sentence. In many, if not most, cases transfer to a new facility in the sending state would interfere with a prisoner's rehabilitation more than a return to the original facility. The IAD does not manifest an intent to encourage this type of behavior. Rather, it seeks to achieve its goals by providing for prompt resolution of charges in a receiving state, uninterrupted by returns to the sending state of any sort. Basing decisions on what facility [3] a prison-

er is in rather than who has custody of that prisoner would improperly elevate form over substance and prevent the IAD from serving its intended purposes.

Moreover, the literal reading of the IAD advocated by the government was implicitly rejected by the First Circuit in *Hunnewell.* *Hunnewell* involved Article IV(e) rather than Article III(d). *Hunnewell,* 891 F.2d at 958 n. 3. In *Hunnewell,* the defendant was serving a state prison sentence at the Maine State Prison in Thomaston ("MSP–Thomaston"). The United States Attorney for the District of Maine lodged a detainer for Hunnewell and requested temporary custody of him pursuant to the IAD. The warden of MSP–Thomaston transferred custody of Hunnewell to the USMS, which brought Hunnewell to federal court. After his federal arraignment, Hunnewell was remanded to the custody of the USMS. Maine, like Massachusetts, has no federal pretrial detention center. The USMS housed Hunnewell at MSP–Thomaston while his federal case was pending. Hunnewell, like Kelley, alleged that his return to MSP–Thomaston as well as a brief appearance in state court, violated the IAD. The First Circuit stated that "[t]he fact that [the defendant] was immured at MSP–Thomaston as both a federal prisoner and a state prisoner was, legally, an *irrelevant coincidence* for purposes of the IAD." *Hunnewell,* 891 F.2d at 959 (emphasis added). If "original place of imprisonment", language which appears in both Article IV(e) and Article III(d), were to be interpreted literally, the court in *Hunnewell* would not have charac-

---

**3.** Norfolk keeps detailed records of where a prisoner is housed that specify unit, room and bed. Most correctional facilities probably keep similar records. A truly literal interpretation of the IAD would require finding no violation if a defendant was returned to a different bed, room or unit than the one in which he was originally imprisoned. In some

cases, there is a greater difference in the conditions of confinement and availability of rehabilitative programs as between different units in the same prison than there is as between different prisons. *See, e.g., Strachan v. Ashe,* 548 F.Supp. 1193 (D.Mass.1982) (describing conditions of hospital isolation cell at Hampden County House of Corrections).

terized the defendant's presence as a federal prisoner at MSP–Thomaston as "irrelevant."

*Hunnewell* deals with Article IV(e) rather than Article III(d), which governs this case. However, *Hunnewell* indicates that there is no material difference between the two anti-shuttling provisions. When the First Circuit excerpted what it described as the "material part" of Article IV(e) it omitted the reference to Article V(e). *Id.* at 958 n. 3. Thus, *Hunnewell* appears to render Article IV(e)'s reference to a return pursuant to Article V(e) immaterial for present purposes. The only other differences between Article IV(e) and Article III(d) are semantic. Thus, *Hunnewell* indicates that the key to determining whether the anti-shuttling provisions of either Article III(d) or Article IV(e) have been violated is who has custody of the defendant rather than the "irrelevant coincidence" of where the defendant is imprisoned.

In *Hunnewell,* the First Circuit held that a one-day removal to state court was not a violation of the IAD. *Hunnewell,* 891 F.2d at 959. The court wrote:

> [W]e cannot say that the IAD was infracted when, on March 18, the state's writ of habeas corpus was honored and Hunnewell was taken to superior court. *U.S. v. Taylor*controls. There, the defendant was in custody as a state prisoner. He was brought to federal court, arraigned on federal charges, and then immediately returned to the same state jail, still in state custody. We held that the IAD had not been abridged. 861 F.2d 316, 319 (1st Cir.1988). Judge Coffin wrote:

>> Undoubtedly, the requirement that a prisoner be tried before being returned to his original jurisdiction primarily was designed to avoid the shuttling of prisoners back and forth between institutions in different states or in distant parts of the same state. It makes no sense to interpret the provision to prevent the federal government from returning a prisoner on the same day to a state institution located across town after a brief proceeding. So long as the charges against a prisoner are resolved within the time limits provided by the IAD, the purposes of the Agreement are fully satisfied by allowing the federal government to return a state prisoner to his original place of imprisonment after one brief detention for a federal arraignment or other proceeding.

*Id.* Although the sending and receiving governments are postured differently in this case (county officials having taken defendant briefly and returned him promptly to federal custody), we find the *Taylor* court's rationale to be fully apposite. There was no IAD violation.

*Id.* However, *Taylor's* holding that a one-day appearance in federal court did not trigger the anti-shuttling provisions of the IAD has been overruled by *Bozeman,* which held that the anti-shuttling requirement of Article IV(e) is absolute and no exceptions may be made for violations that "technical" or "de minimis." *Bozeman,* 533 U.S. at 152–54, 121 S.Ct. 2079. The rationale of *Taylor* was "fully apposite" in *Hunnewell. Hunnewell,* 891 F.2d at 959. Because *Taylor* is no longer good law, this aspect of *Hunnewell* is undermined. Consequently, Kelley's brief appearances in state court violated the IAD.

More significantly, Kelley has been in state custody at MCI–Concord since October 8, 2002, where he is now receiving credit for serving his state sentence. As described earlier, the fact that he is no longer being held at Norfolk is not material.

The government argues that if Kelley was returned to state custody he was re-

turned by state employees rather than the USMS, who did not know that Kelley had left Norfolk until after the fact, and, therefore, the IAD has not been violated. However, when the federal government contracts with state authorities to house pretrial detainees, the officials carrying out the state's duties under the intergovernmental agreement are no longer merely state employees. They are also agents of the federal government, who are expected to obey federal court orders. If the USMS relies on state officials to implement federal court orders, it must assure that they meet their responsibilities and must be held accountable if those state officials fail to do so. The injury to the prisoner is not affected by the identity of the official who actually returned him to the custody of the sending state. The identify of that official does not affect whether the IAD has been violated. *See United States v. Pope,* 183 F.Supp.2d 773 (D.Md.2001).

In *Pope,* the USMS had contracted with the State of Maryland to process federal detainees and house them in Maryland institutions. *Id.* at 775 n. 4. The state officials with whom the USMS contracted twice erroneously returned the defendant to state custody. *Id.* at 775. Prior to the decision in *Bozeman,* the District Court found these IAD violations to be "technical" and did not dismiss the case. *Id.* However, after *Bozeman* was decided, the Fourth Circuit reversed and remanded the case to the District Court to decide whether it should be dismissed with or without prejudice. *Id.* at 775–76.

Even though the errors in this case were similarly inadvertent, dismissal is required and the court must decide whether that dismissal should be with or without prejudice.

B. *This Case is Being Dismissed Without Prejudice*

■ When the receiving state is the United States "any order of a court dismissing any indictment, information, or complaint [for an IAD violation] may be with or without prejudice." 18 U.S.C.App. § 9. "In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: The seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of the agreement on detainers and on the administration of justice." *Id.*

The offense involved in this case is serious. Kelley is charged with being a felon in possession of a firearm. He appears to be facing a mandatory minimum fifteen year sentence under 18 U.S.C. § 924(e). The evidence at the suppression hearing involved an armed robbery followed by flight in a vehicle on the wrong side of a city street. The defendant, of course, is presumed innocent. However, the offense charged is serious. This factor weighs towards a dismissal without prejudice. *See United States v. Hastings,* 847 F.2d 920, 925 (1st Cir.1988) ("The graver the crimes, the greater the insult to societal interests if the charges are dropped, once and for all, without a meaningful determination of guilt or innocence.").

In addition, this is not a case in which the government willfully violated the IAD. The violation was the result of an administrative oversight on the part of Norfolk employees. Kelley was apparently the first prisoner to leave Norfolk as a state prisoner and return to Norfolk as a federal detainee who had not waived his rights under the IAD. The fact that the IAD violation was inadvertent militates towards a dismissal without prejudice.

There is also no pattern of IAD violations that needs to be deterred. If there is a future violation of the IAD in the District of Massachusetts, the court expects that the risk of a dismissal with prejudice will be increased. *See Pope,* 183 F.Supp.2d at 777 (dismissing indictment with prejudice for violation of IAD's anti-shuttling provisions when DUSM testified that the multiple IAD violations experienced by the defendant were not isolated occurrences).

"Analysis of [the third] factor involves an assessment of whether the IAD violation prejudiced the defendant." *Id.* at 778. If this case is dismissed without prejudice and the federal charge is brought again, it is probable that Kelley will be prejudiced because of the government's violation of the IAD. If Kelley had not been brought to state court on October 4, 2002, he would not have pleaded guilty to the state charges and received a five to seven year sentence. If Kelley, like most defendants, is convicted on the federal charge against him, he may suffer several forms of prejudice because of his state court conviction.

█ First, since Kelley is earning credit for serving time on his state sentence, it appears that it may be legally impermissible for the Attorney General to give him credit for time served since he returned to state custody and began serving the state sentence on October 8, 2002, notwithstanding any request by the United States Attorney for the District of Massachusetts that Kelley receive such credit. 18 U.S.C. § 3585(b) provides that, "[a] defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences ... *that has not been credited against another sentence.*" (emphasis added). The decision whether to credit any time served in pretrial detention rests initially with the Attorney General rather than the sentencing judge. *See United States v. Wilson,* 503 U.S. 329, 333–35, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992). The Attorney General may have no discretion in the matter. Moreover, since Kelley appears to be subject to a mandatory minimum sentence, there may be no opportunity for the court to depart and impose a shorter federal sentence to take into account the time he serves at MCI–Concord prior to any federal conviction. Thus, there is a significant possibility that, if charged again and convicted of being a felon in possession of a firearm, Kelley will be released from federal custody later than he would have been if the IAD had not been violated.

Second, it is likely that if Kelley had been sentenced on the federal charge before the state charge, the state charge would not have resulted in any additional prison time for Kelley. The state authorities might have chosen not to prosecute Kelley on the state charges if he had received a federal sentence of at least fifteen years. If the state charges were pursued, Kelley could have been sentenced to serve his state sentence concurrently with his federal sentence. Kelley's best hope at this point is for a federal judge to recommend that he serve the first part of any federal sentence concurrent with his state sentence and for the Bureau of Prisons to follow that recommendation. *See generally* Ex. 15, Henry J. Sadowski, Regional Counsel, Northeast Region, Federal Bureau of Prisons, *Interaction of Federal and State Sentences When the Federal Defendant is Under State Primary Jurisdiction.* Even if this occurs, Kelley will not receive credit for the time he has served in state custody prior to the imposition of his federal sentence. Consequently, the IAD violation may well cause Kelley to serve more time in combined federal and state custody than he otherwise would have served.

Kelley asserts that he has suffered two other forms of prejudice as a result of the IAD violation. However, neither contention is correct.

Kelley has not been prejudiced in terms of an elevated criminal history category calculation in a potential sentencing under the United States Sentencing Guidelines in this case. The October 8, 2002 convictions are prior sentences for purposes of calculating Kelley's criminal history. *See* U.S.S.G. § 4A1.2(a) A.N.1. However, even without those convictions, Kelley's criminal history category would be a VI—the highest category. Under U.S.S.G. § 4B1.4(c)(2), "[t]he criminal history category for an armed career criminal is the greatest of … Category VI, if the defendant used or possessed the firearm … in connection with … a crime of violence, as defined in § 4B1.2(a)." Assuming that the government is able to convince a jury beyond a reasonable doubt that Kelley possessed a firearm, the government should also be able to convince a judge by a preponderance of the evidence that Kelley possessed the firearm in connection with a crime of violence—armed robbery.

The court also is not persuaded that Kelley's classification to MCI–Cedar Junction, rather than MCI–Norfolk, was caused by his federal detainer. Thus, Kelley has not established any prejudice resulting from his classification by the MDOC before the resolution of this case.

The factors concerning whether a dismissal should be with or without prejudice listed in 18 U.S.C.App. § 9 are not exclusive. The court may consider other factors and has in this case. The reprosecution of this case will not cause a significant burden on the federal courts because the remaining legal issues do not appear to be complex and the time required to try the charge against Kelley will be relatively brief. This factor weighs against a dismissal with prejudice. However, Kelley could be prosecuted for crimes arising out of the events of January 22, 2002 in state court. This is a case that was initially investigated by the Boston Police Department and Kelley was initially charged in state court. This factor militates towards a dismissal with prejudice.

However, most importantly, the offense charged is serious, and the error that caused the IAD violation was inadvertent and evidently unprecedented. In these circumstances, the public interest in retaining the possibility that Kelley will be held accountable for his alleged federal crime makes it most appropriate that the dismissal of this case be without prejudice. Dismissal without prejudice will give the federal government the discretion to decide whether to devote more of its limited resources to prosecuting Kelley or to permit the Commonwealth of Massachusetts to do so instead.

In view of the foregoing, the court is dismissing this case without prejudice.

## IV. ORDER

Accordingly, it is hereby ORDERED that

1. Defendant Kevin M. Kelley's Motion to Dismiss (Docket No. 38) is ALLOWED and the indictment is DISMISSED as to Kelley WITHOUT PREJUDICE.

2. As the case as against Kelley has been dismissed, defendant Patrick O'Shea's Motion to Sever (Docket No. 29) is MOOT.

3. A pretrial conference to establish a trial date for O'Shea will be held on March 19, 2003, at 9:30 a.m.